**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,

v.

JOHN MICHAEL UNDERWOOD,
*Defendant-Appellee*.

No. 11-50213

D.C. No.
2:10-cr-00863-
SVW-8

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted
December 6, 2012—Pasadena, California

Filed August 6, 2013

Before: Harry Pregerson, John T. Noonan,
and Richard A. Paez, Circuit Judges.

Opinion by Judge Pregerson

## SUMMARY*

### Criminal Law

Affirming the district court's order suppressing drug-trafficking evidence found during a search of the defendant's home, the panel held that the state warrant that authorized the search was not supported by probable cause, and the good faith exception to the exclusionary rule was not met.

### COUNSEL

Mack E. Jenkins, Assistant United States Attorney, Los Angeles, California, for Plaintiff-Appellant.

Donald M. Ré, Los Angeles, California, for Defendant-Appellee.

### OPINION

PREGERSON, Circuit Judge:

Appellee John Underwood was charged with conspiracy to possess and distribute controlled substances under 21 U.S.C. §§ 841 and 846, and possession with intent to distribute cocaine and ecstasy under 21 U.S.C. § 841. In district court Underwood moved to suppress drug trafficking

---

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidence found during a search of his home, arguing that the state warrant that authorized the search lacked probable cause and the good faith exception to the exclusionary rule did not apply. District Judge Stephen Wilson granted Underwood's motion to suppress. The United States appeals. We have jurisdiction under 18 U.S.C. § 3731, and we affirm.

## I.  BACKGROUND

### A.  Federal Warrants & Underwood's Arrest

Between January and July 2010, the Drug Enforcement Administration ("DEA") and the Beverly Hills Police Department conducted a wiretap investigation into a suspected drug trafficking organization headed by Underwood's co-defendant, Jimmy Luong. The investigation revealed that Luong's drug trafficking organization ("Luong DTO") was likely distributing hundreds of thousands of pills of ecstasy per week.

In April 2010, agents followed Luong and Tony Barrera, another one of Underwood's co-defendants, from Barrera's residence to a Home Depot parking lot. There, agents observed Luong and Barrera meeting with Underwood and transferring two large unmarked crates from Underwood's vehicle to their own. Agents used surveillance to track the two crates to a Luong DTO stash house where the crates were subsequently seized and found to contain thousands of ecstasy pills.

On July 22, 2010 federal agents, assisted by local law enforcement including Los Angeles Police Department Detective James Kaiser, simultaneously executed federal arrest warrants for seventeen suspected co-conspirators of the

Luong DTO and federal search warrants for fifteen residences, stash houses, and vehicles. DEA Agent Peter Johnson prepared the 102-page affidavit in support of the federal warrants. Underwood does not contest the affidavit or the execution of the federal warrants.

One of the federal search warrants was executed at a house believed to be Underwood's, on Cantrece Lane in Cerritos, California. When the officers arrived, they found only Underwood's mother, who told them Underwood actually lived on Mansa Drive in La Mirada, California. A search of the Cantrece Lane house did not reveal any evidence of drug trafficking.

Later that day, at the Mansa Drive house, agents arrested Underwood and conducted a protective sweep of the house. During that sweep, agents observed a clear zip-lock bag containing a personal-use amount of marijuana on a table in the living room. Following Underwood's refusal to consent to a full search of the house, DEA Agent Johnson instructed local officers to obtain a state search warrant for the Mansa Drive house as soon as possible. LAPD Detective Kaiser was assigned the task of securing the warrant. To assist Kaiser with the task, Johnson emailed Kaiser a summary of the case against Underwood based on the federal affidavit and an explanation of why Johnson believed evidence would be found at the Mansa Drive house.

**B. State Affidavit & Search Warrant**

Underwood challenges the affidavit supporting the state search warrant for the Mansa Drive house. In the state affidavit, Kaiser first listed the evidence to be seized, including: records of drug transactions, bank account

records, supplier lists, phones, drugs such as ecstasy, drug paraphernalia, currency over $500, personal records such as bills, photographs and videos involving drugs, and firearms.

In a section titled "Statement of Probable Cause for Search Warrant," Kaiser listed his narcotics training and experience. In the next section, titled "Narrative," Kaiser began by stating, "On 7-15-10, I, Detective Kaiser, learned the following from US Drug Enforcement Agent Peter Johnson of the LA Office, Group 4:." The next four and a half pages are in a different font, and are copied nearly verbatim from the federal affidavit prepared by Johnson. Personal experience and opinion statements in these four and a half pages, such as "I believe," "my surveillance observations" and "based on my training, experience," are all initially made by Johnson in the federal affidavit. Kaiser never stated that he was copying directly from Johnson's affidavit, so it is not clear from the affidavit whether Kaiser meant to adopt these statements as his own or whether he meant to quote Johnson. Kaiser declared later, however, that the statements should be read as from Johnson's perspective and based upon Johnson's personal knowledge. The narrative begins:

> On July 15, 2010, United States Magistrate Judge Victor Kenton signed a federal arrest warrant for John Michael Underwood ("Underwood") and a federal search warrant for Cantrece Lane, Cerritos, CA. Underwood is a courier for a multi-hundred thousand pill MDMA[1] drug trafficking organization

---

[1] MDMA is short for methylenedioxymethamphetamine, the chemical name for ecstasy.

("Luong DTO"). On April 14, 2010, Drug
Enforcement Administration ("DEA") Special
Agents and Beverly Hills Police Department
("BHPD") Detectives observed Underwood
deliver two wooden crates to known co-
conspirators Jimmy Luong ("Luong") and
Tony Barrera ("Barrera"). Based on the other
seizures in the investigation, I believe the
crates contained approximately 260,000 pills
of MDMA.

The affidavit does not include any factual details of "the other
seizures" to support Johnson's belief that the crates contained
260,000 pills of ecstasy. The only factual support for the
conclusion that Underwood is a "courier" for the Luong DTO
is that agents observed Underwood deliver two wooden crates
to Luong and Barrera.

The narrative goes on to provide Johnson's opinions
about the general behavior of drug traffickers based on his
training and experience, including that: drug trafficking is a
"continuing criminal activity taking place over months, and
often years"; traffickers "commonly 'front' (provide . . . on
consignment) illegal controlled substances to their clients and
thus keep some types of records concerning monies owed and
payments made"; and traffickers often keep these records at
their residences. The affidavit notes that, based on
"intercepted conversations over TT #1–4, #6–7 and my
surveillance observations, I believe that most of the higher
level members of the LUONG DTO have been given
MDMA" through "fronting" arrangements. The affidavit
does not provide factual details about the "intercepted
conversations" or Johnson's "surveillance observations," or
explain what "TT #1–4, #6–7" means. Johnson's affidavit

from which Kaiser apparently copied explains that "TT" is an abbreviation for "Target Telephones" and lists the target telephone numbers and the suspected co-conspirator who used each number. This information, however, was omitted from Kaiser's affidavit.

Finally, following the four and a half pages copied from Johnson's federal affidavit, Kaiser described his role in the execution of the federal search warrant and Underwood's arrest at the Mansa Drive house. Regarding the finding of marijuana, Kaiser stated: "During the [protective] sweep, Detective Davis saw an amount of what appeared to be marijuana in a zip loc baggie on a table in the living room."

Kaiser did not attach the federal affidavit to his affidavit for the state search warrant for Mansa Drive. Kaiser claims that, because the state warrant was "based on the same underlying probable cause of the federal warrant" and because he referenced the federal warrants in his affidavit, he believed the probable cause stated by the federal affidavit "carried over."

Based on Kaiser's affidavit, a Los Angeles Superior Court judge issued a search warrant for the Mansa Drive house on July 22, 2010. The judge did not ask to review the federal affidavit referenced in Kaiser's state affidavit. The search pursuant to the state warrant resulted in the seizure of thirty-three kilograms of cocaine, $417,000 in cash, 104 ecstasy pills, packaging material, a money counter, and a "pay/owe" sheet.

## C.  Procedural History

Underwood was charged with conspiracy to possess and distribute controlled substances in violation of 21 U.S.C. §§ 841 and 846, and with possession with intent to distribute cocaine and ecstasy in violation of 21 U.S.C. § 841. Underwood filed a motion to suppress the evidence seized from his Mansa Drive house.  Underwood argued that the affidavit supporting the state search warrant for Mansa Drive lacked probable cause.  Underwood also argued the good faith exception to the exclusionary rule established in *United States v. Leon*, 468 U.S. 897 (1984) did not apply because the affidavit was a "bare bones" affidavit that lacked indicia of probable cause.

District Judge Stephen Wilson granted the motion to suppress.  In a lengthy, scholarly order, Judge Wilson concluded that the affidavit supporting the state search warrant lacked probable cause because the affidavit set forth mostly conclusory allegations and only two facts— Underwood's delivery of undescribed crates to Luong three months before the warrant application and an observation of a personal-use amount of marijuana in Underwood's home. The district court further concluded that the good faith exception did not apply because the affidavit did not make a colorable showing of probable cause, and was thus a bare bones affidavit.  The United States timely filed a Notice of Appeal.

## II.  STANDARD OF REVIEW

We review a district court's rulings on motions to suppress and the validity of search warrants *de novo*.  *United States v. Crews*, 502 F.3d 1130, 1135 (9th Cir. 2007); *United*

*States v. Jones*, 286 F.3d 1146, 1150 (9th Cir. 2002). We give "great deference" to an issuing judge's finding that probable cause supports a warrant and review such findings for clear error. *United States v. Krupa*, 658 F.3d 1174, 1177 (9th Cir. 2011). We review a district court's application of the good faith exception to the exclusionary rule *de novo*. *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006).

## III. DISCUSSION

The government appeals the district court's grant of Underwood's motion to suppress, arguing that (1) the warrant was supported by probable cause; and (2) if the warrant was not supported by probable cause, the good faith exception applies. We are not persuaded by these arguments.

### A. Probable Cause

A search warrant is supported by probable cause if the issuing judge finds that, "given all the circumstances set forth in the affidavit before him . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A reviewing court should find that probable cause is not met when the issuing judge lacked a "'substantial basis for . . . conclud[ing]' that probable cause existed." *Id.* at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Conclusions of the affiant unsupported by underlying facts cannot be used to establish probable cause. *See United States v. Cervantes*, 703 F.3d 1135, 1139–40 (9th Cir. 2012) (affording little if any weight to detective's conclusory statement that, based on his training and experience, the box in defendant's possession came from a suspected narcotics

stash house); *see also Spinelli v. United States*, 393 U.S. 410, 418 (1969); *Gates*, 462 U.S. at 241. An affidavit must recite underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions; it is these facts that form the central basis of the probable cause determination. *United States v. Ventresca*, 380 U.S. 102, 108–09 (1965); *Giordenello v. United States*, 357 U.S. 485, 486 (1958) ("The Commissioner must judge for himself the persuasiveness of the *facts* relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.") (emphasis added); *United States v. Rubio*, 727 F.2d 786, 795 (9th Cir. 1983) ("The magistrate must be provided with sufficient *facts* from which he may draw the inferences and form the conclusions necessary to a determination of probable cause.") (emphasis added); *United States v. Dubrofsky*, 581 F.2d 208, 212 (9th Cir. 1978) ("A search warrant may not rest upon mere affirmance or belief without disclosure of supporting facts or circumstances.").

Expert opinion may also be considered in the totality of the circumstances analysis for probable cause. *See, e.g*, *United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995). As we held in *United States v. Weber*, however, "if the government presents expert opinion about the behavior of a particular class of persons, for the opinion to have any relevance, the affidavit must lay a foundation which shows that the person subject to the search is a member of the class." 923 F.2d 1338, 1345 (9th Cir. 1990).

In *Weber*, we concluded that an affidavit supporting a search warrant of the defendant's house lacked probable cause where it contained only the following information: (1)

an allegation that two years previously, the defendant had received advertising material that was "apparently" child pornography; (2) an allegation that the defendant recently ordered materials in response to a child pornography advertisement created by the government; and (3) expert opinion about the habits of "child molesters," "pedophiles," and "child pornography collectors." *Id.* at 1344–46. The affidavit neither defined child molester, pedophile, or child pornography collector. *Id.* at 1341. We found that the ordering of child pornography materials from the government advertisement did not make the defendant a child pornography collector when the affidavit failed to define the term. *Id.* at 1345–46. Moreover, the affidavit failed to assert let alone set forth facts to prove that the defendant was a member of any of the three groups. *Id.* For this reason, we concluded that the opinion about child molesters, pedophiles, and child pornography collectors was "foundationless." *Id.* at 1345. Therefore, the expert opinion could not be used to support probable cause. *Id.* at 1345–46. Finally, we found that the affidavit did not support a conclusion that child pornography materials would be found at the defendant's house. *Id.* We reasoned that reaching such a conclusion from the factual allegations in the affidavit required that we draw too many inferences: "[e]ach of these inferences standing alone may be reasonable. But with each succeeding inference, the last reached is less and less likely to be true." *Id.* at 1345.

When viewed in the totality of the circumstances, the affidavit here fails to provide a sufficient basis for probable cause. Like the affidavit in *Weber*, the affidavit in Underwood's case includes only two facts, foundationless expert opinion, and conclusory allegations.

First, the affidavit describes Detective Davis's observation of a baggie of a personal-use amount of marijuana at Underwood's Mansa Drive home during the protective sweep. Although this description is a sufficiently detailed factual allegation, it lacks a nexus with ecstasy trafficking and therefore does not support the conclusion that Underwood is a ecstasy trafficker. Both the amount and the type of drug observed are important. As Kaiser's affidavit explained, drug traffickers often keep evidence of their trafficking activities—such as their inventory of drugs, cash from sales, and records from sales—at their homes. Thus, if police had observed a large amount of drugs in Underwood's home, especially in combination with a large amount of cash or apparent drug business records, this would support the conclusion that Underwood is a drug trafficker. But all that police observed was a personal-use amount of marijuana in Underwood's home, which supports only the inference that Underwood is a marijuana user. This evidence does not indicate that Underwood uses ecstasy, a drug entirely different from marijuana, and it certainly does not indicate that he is an ecstasy *trafficker*. *See United States v. Vizcarra-Martinez*, 66 F.3d 1006, 1016 n.8 (9th Cir. 1995) (holding that "evidence of drug use or mere possession cannot be used to prove that the defendant possessed a different type of drug with intent to distribute" because the relationship between the two are so attenuated). Thus, the personal-use amount of marijuana observed in Underwood's home fails to support the conclusion that Underwood is a courier for an ecstasy trafficking organization or that evidence of such trafficking would be found at Underwood's home.

Second, the fact that agents observed Underwood deliver two wooden crates to Luong and Barrera on one occasion three months before the warrant application hardly supports

the conclusion that Underwood is a drug courier working for Luong.  The affidavit does not make any other factual assertions indicating that Underwood made other deliveries to Luong or Barrera or even had contact with Luong or Barrera at any other time.  Moreover, the affidavit neither includes a description of the crates, nor any other facts that would indicate that the crates contained ecstasy.  We afford little to no weight to the statement, "Based on other seizures in this investigation, I believe the crates contained approximately 260,000 pills of MDMA."  This statement adds the general fact that the investigation resulted in seizures.  Unlike in the federal affidavit, however, the statement is not accompanied by an explanation of the nature of the seizures—for example, what was seized and where the seizures took place.  This statement is thus a bare conclusion because it provides no underlying facts about the seizures from which the issuing judge could draw his or her own conclusion about how, if at all, the seizures indicate that the two crates contained ecstasy.

Third, the affidavit contained Johnson's beliefs about drug traffickers' general habits based on Johnson's experience and training, including that drug traffickers often keep records from drug transactions at their residences.  In *Weber*, even where the affidavit alleged that the defendant had ordered child pornography in the recent past, we found this fact did not support the conclusion that defendant was a "child pornography collector" because the affidavit failed to define the term.  923 F.2d at 1345–46.  Here, the affidavit not only fails to define "drug trafficker" but it also provides no *facts* to support the conclusion that Underwood is in the business of buying and selling ecstasy.  Moreover, the affidavit does not even assert that Underwood is a drug trafficker.  Instead, the affidavit describes Underwood as a

"courier."  As District Judge Stephen Wilson explained, the two terms have different meanings: while a trafficker is someone who is in the business of buying and selling items, a courier is "one who merely delivers items (in this context, contraband) but does not typically trade, buy, or sell the items being delivered."  Thus, Kaiser's conclusions about drug traffickers—which were based exclusively on Johnson's opinions—are foundationless as to Underwood.  Hence, they cannot be used to support a finding of fair probability that drug trafficking evidence would be found at Underwood's home.

Detective Kaiser's statement that a federal warrant had previously issued in the case for a different residence does not add any indicia of probable cause to the state affidavit.  First, neither the federal warrant nor the 102-page federal affidavit were attached to the state affidavit.  In this situation, the mere assertion of the prior issuance of the federal warrant for a different property should not be treated as a "supporting fact or circumstance" for probable cause purposes.  The Supreme Court stated in *Leon* that in issuing a warrant, a judge must "perform his neutral and detached function and not serve merely as a rubber stamp for the police."  468 U.S. at 914; *see also Ventresca*, 380 U.S. at 108–09 ("Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.").  If we allow judges to rely on the mere assertion that another judge previously issued a warrant in the case without also relying on that other judge's analysis or supporting facts, we would encourage judges to rubber-stamp the conclusions of law enforcement and of each other.  Second, and more importantly, this case concerns *two different* affidavits.  The unattached federal affidavit that supported the previously issued federal warrant

is *entirely different from* the state affidavit at issue here. While the federal affidavit detailed the federal investigation of Underwood and his co-defendants in 102 pages, the affidavit in this case was specific to Underwood and, as explained above, contained mostly conclusory allegations and only two facts, one of which—the personal-use amount of marijuana—was entirely distinct from the federal warrant. Thus, the prior issuance of a federal warrant based on different and more complete information adds no indicia of probable cause to the state affidavit.

Finally, the rest of the affidavit is made up of conclusory allegations. These allegations are either entirely unsupported by facts or are explained as based on "other seizures," "intercepted conversations over TT #1–4, #6–7" or "my surveillance observations," meaning Johnson's surveillance observations. As explained above, these vague explanations add little if any support because they do not include underlying facts that the issuing judge may use to evaluate the affiant's reasoning or to draw his or her own inferences. For example, the affidavit does not explain who was being surveilled, what was observed, whom the intercepted conversations were apparently between, or what was said during those conversations. From the allegations as written, the issuing judge would have to trust Kaiser and DEA Agent Johnson that the information from the intercepted conversations and surveillance supports their conclusions. Thus, we see these allegations as essentially conclusory statements, and afford them little if any weight in the probable cause analysis.

When viewed in the totality of the circumstances, the affidavit fails to establish probable cause. The affidavit does not give a reasonable judge sufficient basis to find that it was

fairly probable that Underwood was an ecstasy courier or that evidence of ecstasy trafficking would be found at Underwood's house.  To conclude from the affidavit that Underwood is a courier for the Luong DTO requires either blind trust in Johnson's conclusory statements or the drawing of too many inferences.  One would have to infer from the crate delivery—the only factual allegation with a nexus to the crime charged—that: (1) Luong and Barrera are conspirators in a drug trafficking organization, (2) the crate contained ecstasy, and (3) Underwood knew or had reason to know the crates contained ecstasy.  Further, the affidavit lacks *any* basis from which to conclude that any of the evidence listed in the affidavit would be found at Mansa Drive, given that expert opinion on drug traffickers keeping such evidence at their homes was foundationless.  For these reasons, the resulting search warrant for Mansa Drive is defective under the Fourth Amendment.

## B.  Good Faith Exception

If a warrant lacks probable cause, evidence obtained during its execution should generally be suppressed under the exclusionary rule.  *Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks v. United States*, 232 U.S. 383, 393 (1914).  While the Supreme Court has articulated various rationales for the exclusionary rule, the rule's primary purpose has been to deter law enforcement from carrying out unconstitutional searches and seizures.  Although the exclusionary rule is often framed as a nuisance to law enforcement, we view it as a promoter of police professionalism and education.  *See Herring v. United States*, 555 U.S. 135, 156 n.6 (2009) (Ginsburg, J., dissenting) (noting that "professionalism is a sign of the exclusionary rule's efficacy . . . .").  The exclusionary rule has helped police more effectively secure

good evidence without violating the law and the rights of American citizens. *See, e.g.*, Myron Orfield, *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Narcotics Officers*, 54 U. Chi. L. Rev. 1016, 1036–40 (Summer 1987); Stephen H. Sachs, *The Exclusionary Rule: A Prosecutor's Defense*, 1 Crim. Just. Ethics 28, 31–32 (1982). The rule has also improved the quality of police training, education, and case reporting. *See* Wayne LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 1.2(b) at 33 (4th ed. 2004); Yale Kamisar, *Public Safety v. Individual Liberties: Some "Facts" and "Theories"*, 53 J. Crim. L. Criminology & Police Sci. 171, 179–81 (1962); Orfield, *supra*, at 1028, 1040; Sachs, *supra*, at 31–32.

Despite the benefits of the exclusionary rule, significant exceptions to the rule have developed. Under these exceptions, evidence seized pursuant to a defective warrant will not be suppressed. One such exception is the "good faith" exception established by *Leon*, which is satisfied if an officer acts "in objectively reasonable reliance" on the warrant. 468 U.S. at 922. To determine whether the officer acted in objectively reasonable reliance, "all of the circumstances—including whether the warrant application had previously been rejected by a different magistrate—may be considered." *Id.* at 922 n.23; *see also Messerschmidt v. Millender*, 132 S. Ct. 1235, 1249–50 (2012) (where the Supreme Court considered whether an officer had a superior review the challenged affidavit to determine if the officer acted in reasonable reliance, thus clarifying that courts can look beyond the four corners of the affidavit to consider extrinsic factors in the good faith analysis). The burden of demonstrating good faith rests with the government. *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995).

The Court in *Leon* identified four situations that *per se* fail to satisfy the good faith exception. In these situations, "the officer will have no reasonable grounds for believing that the warrant was properly issued." 468 U.S. at 922–23. The four situations are: (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge "wholly abandon[s] his [or her] judicial role"; (3) where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4) where the warrant is "so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* (internal quotations omitted). If any of these four situations apply, as we explained in *United States v. Luong*, we "need not inquire further" and can conclude that the good faith exception to the exclusionary rule does not apply. 479 F.3d at 905. The third situation, which we also refer to as a "bare bones" affidavit, applies in this case.

An affidavit is so lacking in indicia of probable cause, or bare bones, when it fails to provide a colorable argument for probable cause. *United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988). A colorable argument is made when "thoughtful and competent judges" could disagree that probable cause does not exist. *Id.* at 139 (internal quotations omitted). Here, we agree with Underwood that the affidavit submitted by Kaiser in support of the state search warrant for Underwood's Mansa Drive house was so deficient as to render official belief in its existence entirely unreasonable. Reasonable judges could not disagree that probable cause to search for drug trafficking evidence at Mansa Drive did not exist.

As discussed in part A, the affidavit fails to set forth a sufficient factual basis for the conclusion that Underwood is a courier for an ecstasy trafficking organization. The only fact with any degree of support for this conclusion is the observation that, three months before the warrant application for Mansa Drive, Underwood delivered two wooden crates to Luong and Barrera in a Home Depot parking lot. There are no accompanying facts in the affidavit to support the inferences that the crates contained ecstasy or that Underwood knew or should have known the crates contained ecstasy. Kaiser advanced DEA Agent Johnson's belief that the crates contained ecstasy, but did not provide underlying facts that could be used to judge the reasonableness of Johnson's belief.

Moreover, the affidavit provides *no* factual basis for the conclusion that drug trafficking evidence would be found at Underwood's home. As explained in part A, the expert opinion about drug traffickers keeping evidence of their crimes at their homes is foundationless because the affidavit did not assert that Underwood was a drug trafficker, and thus cannot be used to support probable cause. Further, even if we make the unreasonable inferences that the crates contained drugs and that Underwood knew the crates contained drugs, Underwood delivered those crates to Luong and Barrera, who took them away from him. We thus cannot conclude that any drugs contained in those crates were in Underwood's possession, let alone at Underwood's house in particular. The affidavit does not assert that any other deliveries by Underwood to anyone else ever took place. Thus, it would also be unreasonable to conclude that Underwood ever possessed any other crates, let alone that such crates would be at Underwood's house.

Ultimately, the affidavit reasonably supports only the following innocent conclusions: Underwood knows Luong and Barrera; he helped Luong and Barrera move two crates on one occasion[2]; and Underwood possibly uses marijuana. Reasonable judges would agree that probable cause did not exist to search Underwood's Mansa Drive house because the affidavit provides only the most attenuated support for the conclusion that Underwood is a drug courier and no support for the conclusion that drug trafficking evidence would be found at Mansa Drive. Thus, the affidavit was a bare bones affidavit, and the good faith exception to the exclusionary rule is *per se* not met.

The government cites *Messerschmidt* for the proposition that extrinsic evidence should be considered in determining whether the affidavit was a bare bones affidavit. In *Messerschmidt*, the Supreme Court found that the good faith exception to the exclusionary rule applied, and thus any potential overbreadth as to the scope of the search would not result in the exclusion of any evidence seized as a result of the search. 132 S. Ct. at 1250. In determining that the officer's reliance was reasonable, the Court gave weight to the fact that the officer sought and obtained approval of the warrant application from both a superior officer and a deputy district attorney. *Id.* at 1249. In so doing, the Court demonstrated that evidence extrinsic to the affidavit can be considered in a good faith determination. But *Messerschmidt* did not change the law regarding *Leon*'s four *per se* situations that fail to satisfy good faith, including the situation that applies here.

---

[2] The circumstances are certainly suspicious, but not clear enough to warrant a conclusion.

The language of *Leon* makes clear that we need not consider extrinsic factors in making the bare bones affidavit determination. Before describing the four situations that *per se* fail to establish good faith, the *Leon* Court stated, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." 469 U.S. at 922–23. Thus, in these four circumstances, including the circumstance of a bare bones affidavit, the officer can never have a reasonable ground for believing the warrant had probable cause.

Moreover, in explaining the bare bones affidavit situation in particular, the Court in *Leon* stated, "[n]or would an officer manifest objective good faith in relying on a warrant based on *an affidavit* so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." 468 U.S. at 923 (1984) (emphasis added) (internal quotation marks omitted). This language makes clear that when the affidavit *itself* lacks indicia of probable cause, simply looking at the affidavit would be sufficient to alert any reasonable officer that probable cause does not exist. Accordingly, when we have determined that the affidavit is a bare bones affidavit, as we have here, even if the extrinsic factors point to reasonableness, they would not change the result. Reliance upon a bare bones affidavit is never reasonable.

Thus, once we determine that the affidavit is a bare bones affidavit, we can conclude the good faith exception is not met, and end the inquiry without looking to extrinsic factors. *See Luong*, 470 F.3d at 905 ("Given that the facts of this case fall squarely within the situation explicitly identified in *Leon* as one in which the good faith exception does not apply, we need not inquire further.").

We briefly note, however, that even assuming *arguendo* the affidavit was not a bare bones affidavit, the good faith exception is not met in this case.

First, at the time the affidavit was prepared, the law was clear that an affidavit must have sufficient factual information and that the issuing magistrate is not permitted to consider evidence extrinsic to the affidavit in his or her determination of probable cause. *See, e.g.*, *Ventresca*, 380 U.S. at 108–09; *United States v. Anderson*, 453 F.2d 174, 175 (9th Cir. 1971). In light of this established law, Kaiser's claim that he thought the probable cause of the unattached federal affidavit carried over to his state affidavit was unreasonable. The claim is especially unreasonable in a case such as this where the previously issued warrant was based on an entirely different, and much more thorough, affidavit.

Second, even if Kaiser was under time pressure to complete the affidavit, this pressure would not weigh in favor of reasonableness in this case. As we explained in *Weber*, time pressure is invalidated as a factor when the government controlled the search's timing because "[u]nder these circumstances, there [is] no need for the hurried judgment upon which law enforcement decisions must often be based." 923 F.2d at 1346 (internal quotation marks omitted). Like in *Weber*, the search in this case need not have been conducted imminently. Officers had taken Underwood into custody and had done a protective sweep of the Mansa Drive house before they applied for the search warrant for Mansa Drive. Thus, any time pressure Kaiser experienced is irrelevant to a good faith determination.

Finally, unlike the situation in *Messerschmidt*, Kaiser did not have a supervisor or anyone else review, let alone

approve, his affidavit. *Messerschmidt* established that whether "the officer[] sought [or] obtained approval of the warrant application from a superior [or] . . . district attorney before submitting it to the magistrate provides further support that an officer could have reasonably believed [the warrant had probable cause]." 132 S. Ct. at 1249. Kaiser's cutting and pasting of the portions of the affidavit sent by Johnson, without attribution, is not the same thing as the review and approval by a superior or even peer officer. Such a shortcut provides no basis for any reasonable belief that the warrant for the Mansa Drive residence was supported by probable cause.

An analysis of the totality of the circumstances, including extrinsic factors, establishes that reliance on the search warrant for Mansa Drive was objectively unreasonable. Thus, even assuming the affidavit was not entirely lacking in indicia of probable cause, the good faith exception is not met in this case.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the evidence against Underwood was obtained without a warrant based on probable cause, and the good faith exception to the exclusionary rule is not met. Accordingly, the district court's order granting the motion to suppress evidence is **AFFIRMED.**