**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JARED ARMSTRONG,
            *Plaintiff-Appellee*,

v.

GERARD ASSELIN; KEVIN
VANDEGRIFF; MARK THOMAS; LEE
ROHWER; WALTER GILMOUR; DAVID
PARKER; MUNICIPALITY OF
ANCHORAGE,
            *Defendants-Appellants*.

No. 10-35777

D.C. No.
3:07-cv-00243-
TMB

OPINION

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted July 25, 2011
Submission Withdrawn August 3, 2011
Resubmitted October 2, 2013[*]
Anchorage, Alaska

Filed November 1, 2013

---

[*] We withdrew this case from submission pending the Supreme Court's decision in *Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012). After *Messerschmidt* came down, we obtained supplemental briefs addressing its effect on this case.

Before: Andrew J. Kleinfeld, Sidney R. Thomas,[**]
and Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Kleinfeld

## SUMMARY[***]

### Civil Rights

The panel reversed the district court's order denying qualified immunity to police officers and remanded for dismissal of an action brought under 42 U.S.C. § 1983 by a pro se plaintiff who alleged that his Fourth Amendment rights were violated when his home, workplace, and car were searched and he was arrested for disseminating indecent materials to minors.

Plaintiff's claim against the defendants was that a reasonable officer would know that the warrant applications failed to establish probable cause. The panel held that given the circumstances of this case, the police officers, prosecutors, and judicial officials were not plainly incompetent in concluding that there was a fair probability that the searches would turn up evidence of stalking and

---

[**] Judge Betty B. Fletcher was a member of the panel but passed away after oral argument. Judge Thomas was drawn to replace her. He has read the briefs, reviewed the record, and listened to the tape of oral argument held on July 25, 2011.

[***] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

dissemination of indecent material to minors. The panel noted that police officers subjected every step of their invasions of plaintiff's privacy to evaluation both by prosecutors and by neutral judicial officials before they acted. The panel held that such prior review of proposed searches and arrests supported qualified immunity, shielding police officers from liability under the line of cases reaffirmed and broadened most recently by *Messerschmidt v. Millender*, 132 S. Ct. 1235 (2012).

## COUNSEL

Joyce Weaver Johnson (argued), Assistant Municipal Attorney; Dennis A. Wheeler, Municipal Attorney, Municipality of Anchorage, Anchorage, Alaska, for Defendants-Appellants.

Jared Armstrong (argued), pro se, Anchorage, Alaska, Plaintiff-Appellee.

## OPINION

KLEINFELD, Senior Circuit Judge:

Armstrong sued several police officers and the municipality that employed them.[1] His forty-three page second amended complaint is pro se and hard to understand,

---

[1] Armstrong has not appealed the district court's order dismissing his suit against the officers in their official capacity and the municipality of Anchorage. The six officers appeal the district court's order denying them qualified immunity. We address only that aspect of this case.

but the core of it is a § 1983 claim for violation of his Fourth Amendment rights in their searches and seizures and his arrest pursuant to warrants. The police officers moved to dismiss based on qualified immunity, their motion was denied in district court, and they have filed this interlocutory appeal pursuant to *Mitchell v. Forsyth*.[2] We reverse.

## BACKGROUND

The initial proceedings took place in state court. The parents of a fourteen-year-old boy, L.T., came to the police complaining that Armstrong, a man in his late thirties, was befriending and giving pornography to their son. The parents told Officer Asselin that Armstrong met their son online and had communicated with him through email, instant messaging, and over the phone. The boy's mother had seen that Armstrong was talking to her son over instant messaging about "drinking tequila and about giving a 'blow job' to his teacher." The parents also told Asselin that, after coming home from a movie, L.T. was carrying a copy of *Satan Burger*—the book they thought was pornographic. The parents gave the book to Asselin, who, after looking over portions of it, thought the book might qualify as "indecent" under an Anchorage municipal code section prohibiting distribution of indecent material to minors.[3]

---

[2] *Mitchell v. Forsyth*, 472 U.S. 511, 526–28 (1985).

[3] The ordinance defines the following as "indecent material":

> [A] picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body which depicts sexual excitement, sexual conduct, or sado-masochistic abuse which is harmful to minors; a book pamphlet,

The cover of *Satan Burger* has a picture of naked buttocks squatting over a dinner plate. The book describes itself as a "collage of absurd philosophies and dark surrealism . . . [f]eaturing a city overrun with peoples from other dimensions . . . a man whose flesh is dead, but his body parts are alive and running amok, an overweight messiah, the personal life of the Grim Reaper, lots of classy sex and violence, and a fast food restaurant owned by the devil himself." The pages included in the record and provided to the magistrate judges are bizarre. As best we can tell, the part claimed to be

> magazine, printed matter, however produced, or sound recording which contains any matter enumerated in this definition or explicit and detailed verbal description or narrative accounts of sexual excitement, sexual conduct, or sado-masochistic abuse, and which is harmful to minors; or an enactment of sexual conduct or sado-masochistic abuse, or exhibition of sexual excitement, by one or more persons.

"Harmful to minors" is defined as:

> [T]hat quality of any description or representation, in whatever form, of sexual conduct, sexual excitement, or sado-masochistic abuse if, when taken as a whole, it:
>
> (a) According to contemporary community standards appeals to the prurient interest in sex;
>
> (b) Portrays sexual conduct, sexual excitement or sado-masochistic abuse; and
>
> (c) Does not have serious literary, artistic, political or scientific value.

"Sexual conduct" is defined as "any sexual act, normal or perverted, or any act of masturbation, excretory functions, or lewd exhibition of the genitals." Anchorage Municipal Code § 8.50.020.

pornographic appears to describe a nightmarish sexual encounter between a man and some sort of female alien creature who injures and kills people, or perhaps kills some other sort of man-like creature.

About a week later, another couple approached the police concerned about their own son, M.L., and his contact with Armstrong. As with L.T., M.L. met Armstrong online. M.L. was friends with L.T. and was with him when Armstrong gave *Satan Burger* to L.T. in the parking lot of a movie theater. Armstrong also gave M.L. a web cam, knives, a bag, and an inflatable alien doll. At one point, Armstrong told M.L. to go to a secret location to pick up some musical equipment and suggested that M.L. should take a weapon with him to the secret location. After the investigation into Armstrong began, he sent a series of messages to M.L. demanding to know why M.L. had cut off contact, adding that he would "try to defend myself and respond to whatever bullshit the cops told you, but you, your brother, and your dad won't even let me."

L.T. and M.L.'s fathers each called Armstrong individually and told him not to contact their families any more. After those conversations, Armstrong changed one of his online screen names to "John [L] is a pedophile" (John [L] is the father of M.L.) and continued to contact L.T. despite the parental demand that he stop. Officer Asselin obtained what are called *Glass* warrants to record these conversations, as required under Alaska law.[4]

---

[4] *State v. Glass*, 583 P.2d 872, 881 (Alaska 1978) (requiring that a warrant be obtained to record a conversation, unless all parties consent to the recording).

On November 21, 2005, a search warrant was issued on the basis of an affidavit describing the above facts in great detail. The warrant application also included a four-page excerpt of *Satan Burger*, photocopies of the cover picture, author statement, and copies of the online communication between Armstrong and the boys. The warrant commanded[5] a search of Armstrong's home for evidence of disseminating indecent material to minors and of stalking.[6] Officer Asselin simultaneously obtained an arrest warrant charging Armstrong with disseminating indecent material to minors. The state district judge who approved both warrants reviewed the applications at the same time, did not request the full copy of *Satan Burger*, and consulted the dissemination ordinance prior to signing. The following day, after arresting Armstrong, Officer Asselin obtained search warrants for Armstrong's car and his workplace desk, again to search for evidence of stalking and dissemination of indecent material to minors. Computers from Armstrong's workplace and home were seized during these searches. A preliminary search of the computers revealed photographs of identified victims "using a toilet," a book about why men abuse children, and videos of nude young males.

The municipal charge for disseminating indecent material to minors was eventually dismissed by the municipal prosecutor on March 10, 2006. Before returning the property

---

[5] The Alaska search warrant form, like most, says to police officers, "You are hereby commanded to search . . . ."

[6] In Alaska, a person commits the crime of stalking in the second degree by knowingly engaging in "repeated acts of nonconsensual contact involving the victim or a family member," that "recklessly places [them] in fear of death or physical injury, or in fear of the death or physical injury of a family member." ALASKA STAT. § 11.41.270.

that had been taken during the investigation, Officer Asselin decided to look at it more thoroughly than he had. Armstrong's hard drives contained a photograph of two naked prepubescent boys, one performing fellatio on the other. Upon discovering the photograph, the police stopped looking at the material on the drives until they got another search warrant to examine all the computer media and other sources for evidence of possession "and/or" distribution of child pornography. After getting this latest warrant, the police found at least 274 photographs of minors previously identified as having been sexually exploited. Officer Asselin then arrested Armstrong for possession of child pornography on August 1, 2007. Three subsequent search warrants were issued to search Armstrong's Myspace account, residence, and finally his Hotmail account for possession "and/or" distribution of child pornography. The last two of these warrants were issued to Officer Vandegriff.[7] Each of the affidavits in support of these warrants set out the facts just described.

This second criminal case against Armstrong ended after the Alaska Superior Court granted a motion to suppress all the evidence. The court concluded that the *Glass* warrant to record the telephone call between Armstrong and L.T.'s father was not supported by probable cause to show that Armstrong was disseminating indecent material to minors. The Anchorage ordinance defines "indecent material" as that which, "taken as a whole," violates the indecency standards and lacks serious literary, artistic, political or scientific value. Officer Asselin gave the magistrate a little bit of the book and

---

[7] Over the course of the investigation, officers Thomas, Rohwer, Gilmour, and Parker interviewed the victims and assisted in both the searches of Armstrong's residence and property and his arrests.

said in his affidavit that he had "reviewed portions of the book" and found "one particular portion of the book [that] explicitly describes a sexual encounter." Since neither the police officer nor the issuing magistrate had read the book as a whole, the Alaska Superior Court ruled that there was no probable cause to believe *Satan Burger* was indecent under the ordinance, so there was no probable cause for the *Glass* warrant. The Superior Court expressed concern that "search warrants issued upon showings such as this would easily implicate school teachers, public librarians and well established booksellers for dissemination of indecent material to minors." Because all the subsequent warrants were "based upon statements made during that initial [recorded telephone] conversation" between Armstrong and the boy's father, evidence gathered under those warrants was likewise tainted and the motion to suppress all evidence was granted.

Armstrong then sued Officer Asselin, five other police officers, and the Municipality of Anchorage in federal district court for violating his constitutional rights. He represented himself. Defendants moved for summary judgment based on qualified immunity. In his affidavit supporting summary judgment, Officer Asselin said that the eleven warrants obtained were sought by two police officers (himself and Vandegriff), issued by five different judicial officials, and that, at the outset of the investigation and as it proceeded, he had conferred with three municipal prosecutors and then when it became a felony charge, three state prosecutors. None had "expressed concern regarding the validity of the investigation."

The district court dismissed Armstrong's complaint against the municipality and against the officers in their official capacity, but granted him leave to file a third

amended complaint against the officers in their individual capacities. In the order, the district court told this pro se litigant what needed to be set out in the complaint, if true, to survive dismissal. Applying *Saucier v. Katz*[8] and *Zurcher v. Stanford Daily*,[9] the district court concluded that a trier of fact could reasonably conclude that a reasonable police officer would know that his affidavits did not establish probable cause that the book *Satan Burger*, "taken as a whole," was obscene, and therefore the officers were not entitled to qualified immunity. Various subsidiary matters and cross motions regarding sanctions and discovery were also addressed, but are of no significance to this appeal. The police officers appeal the interlocutory order denying the motion for qualified immunity.[10]

## ANALYSIS

The Alaska Superior Court's suppression order was based on the absence of probable cause supporting the initial *Glass* warrant authorizing Asselin to record the conversation between Armstrong and L.T.'s father. The Alaska constitution requires that a warrant issue before surreptitiously recording a conversation.[11] Under federal

---

[8] *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

[9] *Zurcher v. Stanford Daily*, 436 U.S. 547, 564–65 (1978).

[10] This court has jurisdiction to review a district court's denial of qualified immunity under *Mitchell v. Forsyth*, 472 U.S. 511, 526–27 (1985). *See also Liberal v. Estrada*, 632 F.3d 1064, 1074 (9th Cir. 2011).

[11] *State v. Glass*, 583 P.2d 872, 881 (Alaska 1978) ("Alaska's Constitution mandates that its people be free from invasions of privacy by means of surreptitious monitoring of conversations.").

constitutional and statutory law, by contrast, no warrant is necessary so long as one of the two parties to the conversation consents to the recording.**[12]** Since Armstrong's § 1983 civil rights claim must rely on the deprivation of any rights "secured by the Constitution and laws" of the United States, violation of the Alaska constitution alone does not establish a basis for a § 1983 lawsuit. The absence of a good warrant for the recorded conversations with Armstrong is immaterial to this federal case. Armstrong's claims must arise, if at all, from the subsequent search and arrest warrants. We therefore focus on November 21, 2005, when Asselin obtained a warrant to search Armstrong's home, and the arrests and searches on and after that date.

The claim against Asselin and the five other officers is basically that any reasonable police officer should have known that the search and arrest warrants violated the Fourth Amendment. The core of the argument is that a short excerpt of *Satan Burger* could not establish probable cause for a search, because, as the Alaska Superior Court recognized, the Anchorage ordinance requires that the work, "taken as a whole," must be "indecent." The United States district court came to the same conclusion, reasoning that the Anchorage ordinance targeted obscene material and thus probable cause lies only where "the material, *taken as a whole*" is obscene.

---

**[12]** *United States v. White*, 401 U.S. 745 (1971); *United States v. Caceres*, 440 U.S. 741, 744 (1979) ("Neither the Constitution nor any Act of Congress requires that official approval be secured before conversations are overheard or recorded by Government agents with the consent of one of the conversants."); 18 U.S.C. § 2511(2)(c) ("It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.").

Since a few pages could not establish obscenity, or indecency, under the ordinance, a reasonable officer would know that Asselin's warrant applications failed to establish probable cause.

We agree that the excerpt could not by itself establish indecency or obscenity. To be "obscene," *Satan Burger* would have to satisfy the Supreme Court's *Miller* standard: (a) the average person, applying contemporary community standards would find that the work, taken as a whole, appeals to the prurient interest; (b) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.[13] Without examining the work as a whole, the standard cannot be applied. The picture on the cover looks disgusting, as though excretion is suggested, but cannot by itself, or with the short excerpt, establish indecency. It is not clear that even the excerpt "appeals to the prurient interest" any more than a description of disorders and anatomical defects of the vagina found in medical treatises.

This case, though, is not an obscenity case, or a criminal prosecution for obscenity or indecency, or an attempt to limit publication or circulation of any material, including *Satan Burger*. This is a civil lawsuit, primarily for money damages, against police officers for obtaining and executing search and

---

[13] *Miller v. California*, 413 U.S. 15, 24 (1973); *accord United States v. Schales*, 546 F.3d 965, 970 (9th Cir. 2008). As Professor Kathleen Sullivan has put it, the material has to "turn you on and gross you out" at the same time. Jeffrey Rosen, THE NEW ATLANTIS, *The End of Obscenity*, http://www.thenewatlantis.com/publications/the-end-of-obscenity (last visited Sept. 10, 2013).

arrest warrants.[14]  We need not determine whether *Satan Burger* is "indecent" or "obscene," because that does not control whether Officer Asselin and his colleagues are entitled to qualified immunity.  We assume without deciding, for purposes of this decision, that *Satan Burger*, taken as a whole, is not obscene or indecent, and that giving the book to a minor did not violate the Anchorage ordinance.

This assumption, however, does not control the qualified immunity determination for two reasons.  First, all that is needed for a search or arrest warrant is probable cause, not proof, that giving the material to a minor would amount to a violation of the Anchorage ordinance.[15]  The cover (portraying a bare buttocks squatting over a dinner plate) and the few pages support a reasonable belief by a police officer that the work as a whole portrayed excretory functions or sexual conduct in a manner establishing violation of the ordinance.  Even if the book were, on a full reading, not indecent, it would be too much to say that no reasonable police officer could seek a search warrant directed at the premises of the person who gave it to a minor until the police officer had read every word of the book and evaluated its

---

[14] Armstrong also seeks an injunction directing the return of his property and information relating to the investigation of his property.

[15] *Illinois v. Gates*, 462 U.S. 213, 271–72 (1983) ("But *Aguilar* and *Spinelli*, like our other cases, do not require that certain guilt be established before a warrant may properly be issued.  Only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.") (internal quotation marks and citations omitted); *accord United States v. Brobst*, 558 F.3d 982, 997 (9th Cir. 2009) ("Probable cause requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false.") (internal quotation marks and citations omitted).

literary value as a whole. A police officer may be entitled to qualified immunity even for a search and arrest based on invalid warrants if he has a "reasonable belief that the warrant was supported by probable cause."[16] That low standard might be satisfied without reading the book in its entirety, even though the obscenity and municipal indecency standards would not be satisfied for purposes of a criminal conviction.

Second, and most important to the outcome of this case, the police officers subjected every step of their invasions of Armstrong's privacy to evaluation both by prosecutors and by neutral judicial officials before they acted. Such prior review of proposed searches and arrests supports qualified immunity, shielding police officers from liability under the line of cases reaffirmed and broadened most recently by *Messerschmidt v. Millender*.[17]

Reversing our en banc decision, the Supreme Court held in *Messerschmidt* that, even assuming a search warrant should not have been issued, police officers who requested and executed it are immune from suit except in "rare" instances. Presentation to a superior officer and prosecutor, and approval by a judicial officer before the warrant is issued, "demonstrates that any error was not obvious."[18]

> The question in this case is not whether the magistrate erred in believing there was sufficient probable cause to support the scope

---

[16] *Messerschmidt*, 132 S. Ct. at 1250.

[17] *Id.*

[18] *Id.* at 1250.

of the warrant he issued. It is instead whether the magistrate so obviously erred that any reasonable officer would have recognized the error. The occasions on which this standard will be met may be rare, but so too are the circumstances in which it will be appropriate to impose personal liability on a lay officer in the face of judicial approval of his actions.[19]

The Court rejected the notion that review by superiors or magistrates was irrelevant to the controlling question of whether "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."[20] "Indeed, a contrary conclusion would mean not only that [the police officers] were plainly incompetent, but that their supervisor, the deputy district attorney, and the magistrate were as well."[21] Applying the *Leon* standard,[22] the Court held that, where the search or seizure is executed pursuant to a warrant, the fact that a neutral magistrate issued the warrant "is the clearest indication that the officers acted in an objectively reasonable manner."[23] The warrant confers a

---

[19] *Id.*

[20] *Id.* at 1245.

[21] *Id.* at 1249.

[22] *United States v. Leon*, 468 U.S. 897 (1984).

[23] *Messerschmidt*, 132 S. Ct. at 1245.

"shield of immunity"[24] lost only in "rare"[25] circumstances, even for mistakenly issued warrants. It is the "magistrate's responsibility to determine whether the officer's allegations establish probable cause"[26]—that is, a "fair probability" that evidence of a crime will be found.[27] Qualified immunity for police officers does not even require that much, because as *Ashcroft v. al-Kidd* held, the shield "protects all but the plainly incompetent or those who knowingly violate the law."[28]

Under *Messerschmidt*, consulting with and getting approval of one's superiors and of a judicial officer operates for an individual police officer something like liability insurance, though, like liability insurance, there are exceptions and exclusions to protection. One such exception occurs when "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."[29] The Court illustrates this "obvious" standard by reference to a warrant that authorized the search *of* a house *for* a concealed two story house and to seize that house concealed within the house to be searched—an obvious error that would

---

[24] *Id.* at 1245.

[25] *Id.* at 1250.

[26] *Id.* at 1245 (quoting *United States v. Leon*, 468 U.S. 897, 921 (1984)).

[27] *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

[28] *Messerschmidt*, 132 S. Ct. at 1244 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011)).

[29] *Id.* at 1245.

have been revealed by "just a simple glance."[30]  The Court uses the example to show that "obvious" means error that is apparent from a "simple glance" at the face of the warrant itself, not a defect that would "become apparent only upon a close parsing of the warrant application."[31]  Of course, such patent absurdity is not the only way the police officer can lose the shield of immunity.  *Leon* establishes that another way the "high" threshold for establishing an exception to immunity can be crossed is if the officer lied to the issuing magistrate,[32] or if the issuing magistrate did not perform his neutral and detached function, serving instead as a mere "rubber stamp for the police."[33]

*Leon* holds that the exclusionary rule is a policy rule to deter police misconduct, not to punish judicial error, so the purpose of the exclusionary rule is not served by excluding

---

[30] *Id.* at 1250 (discussing *Groh v. Ramirez*, 540 U.S. 551 (2004)).

[31] *Id.* at 1250.

[32] *United States v. Leon*, 468 U.S. 897, 914 (1984) ("the deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based").  In his brief to this court, Armstrong suggests that Asselin and the other officers made material misrepresentations and omissions when seeking the warrants.  These arguments are without support in the record so we do not address the misrepresentation exception to immunity.

[33] *Id.* ("the courts must also insist that the magistrate purport to perform his neutral and detached function and not serve merely as a rubber stamp for the police") (internal quotation marks omitted).

evidence obtained on a warrant mistakenly issued.[34] Likewise, the *Messerschmidt* "shield of immunity" applies to damages awards against individual police officers who obtain and execute warrants.[35]  The "shield" of qualified immunity gives police an incentive to submit their proposed search or seizure to a neutral judicial officer rather than raiding homes and invading privacy on their own.  Once a neutral magistrate approves of the search or seizure, "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."[36]  *Messerschmidt* holds that "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner."[37]  Search and arrest warrants, typically and in this case, say to the police "you are commanded," not "you may," search or arrest.

Since *Messerschmidt* came down, we have identified "rare" exceptions, at least in the context of motions to suppress in criminal cases.  We held in *United States v. Grant* that evidence should have been suppressed where the affidavit established only the most tenuous and remote connection between the evidence sought and the place to be

---

[34] *Id.* at 921 ("Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations.").

[35] *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 651 (1980) (stating that the purposes of § 1983 actions are compensation and deterrence).

[36] *Leon*, 468 U.S. at 921.

[37] *Messerschmidt*, 132 S. Ct. at 1245.

searched, and where there was no review by a superior officer or prosecutor.[38]   The rare exception to the shield applied where there was not even a "colorable argument" and the affidavit set out no "plausible connection" between the place to be searched and objects to be seized and the criminal investigation.[39]  In *United States v. Underwood*, we upheld suppression where a "bare-bones" affidavit contained nothing but "foundationless expert opinion and conclusory allegations," and lacked any recitation of "underlying facts so that the issuing judge can draw his or her own reasonable inferences and conclusions."[40]  Most important, the officer "did not have a supervisor or anyone else review, let alone approve, his affidavit."[41]  Because both these cases must be distinguished on the contents of the affidavits and the lack of review by superior officers or prosecutors, we need not determine whether, after *Messerschmidt*, falling outside *Leon* necessarily means the police officer lacks qualified immunity from suit.[42]

This case is more sensitive than many, because it grows out of the distribution of a book.  As the district court and the Alaska Superior Court recognized, overly aggressive use of

---

[38] *United States v. Grant*, 682 F.3d 827 (9th Cir. 2012).

[39] *Id.* at 841.

[40] *United States v. Underwood*, 725 F.3d 1076, 1081–82 (9th Cir. 2013). The mandate has not, as of this writing, issued in *Underwood*.

[41] *Id.* at 1087–88.

[42] Although falling within *Leon* necessarily means that the police officer does enjoy qualified immunity. *United States v. Needham*, 718 F.3d 1190, 1194 (9th Cir. 2013).

the Anchorage municipal ordinance could indeed threaten school teachers, librarians, and bookstores, if a police officer could merely excerpt the apparently sexual or excretory references from a book to justify searches and arrests. *Zurcher v. Stanford Daily* establishes that warrants may issue even to search a newspaper office for evidence of crimes by third parties, but "where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with scrupulous exactitude."[43] "[W]here seizure is sought of allegedly obscene materials, the judgment of the arresting officer alone is insufficient to justify issuance of a search warrant" and the probable cause determination "must afford an opportunity for the judicial officer to focus searchingly on the question of obscenity."[44] We assume for purposes of this decision that the affidavits in this case were insufficient under *Zurcher* because the cover picture and the four pages of text that the police officers submitted to the judicial officials were not sufficient for the judicial officials to "focus searchingly" on the question of whether *Satan Burger*, as a whole, was indecent or obscene. We do not suggest and need not address whether *Zurcher* affects child pornography searches.

Even if *Zurcher* does bear on searches such as the one at issue, it cannot resolve this case for two reasons. First, *Zurcher* does not speak to the qualified immunity shield, and *Messerschmidt* holds that the shield ordinarily applies even to

---

[43] *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978) (internal quotation marks omitted).

[44] *Id.* at 565 (internal quotation marks omitted).

a mistakenly issued warrant.[45] *Zurcher* speaks to the review a judicial officer must perform before issuing a warrant, not to what an officer must set out in his warrant application in order to preserve qualified immunity.[46] Under *Messerschmidt*, approval by superiors, prosecutors, and a judge almost guarantees the honest police officer's claim to qualified immunity.[47] Officers Asselin and Vandegriff consulted with six prosecutors and obtained warrants from five judicial officials. As *Messerschmidt* holds, we would have to treat all eleven prosecutors and judges as "plainly incompetent" to deny Officer Asselin and the other officers qualified immunity.

Second, the officers in this case were not searching for or seizing *Satan Burger*. They already had the book. The affidavits focused upon the repeated contacts between an older man and underage boys despite parental requests that he leave their sons alone, his giving of gifts to the boys, his suggestion to a boy that he carry a weapon when he retrieved his gifts, and meeting with the boys in secret. The searches were for evidence of disseminating indecent material, stalking the boys, and eventually possession of child pornography, not for the book. The police officers, prosecutors, and judicial officials were not "plainly incompetent" in concluding that there was a fair probability that the searches would turn up evidence of stalking and

---

[45] *Messerschmidt*, 132 S. Ct. at 1245 ("where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable").

[46] *Zurcher*, 436 U.S. at 565.

[47] *Messerschmidt*, 132 S. Ct. at 1245, 1249.

dissemination of indecent material to minors. The subsequent search and arrest warrants were supported by even greater evidence of probable cause, including pictures of the victims urinating, and the photograph of prepubescent boys performing fellatio. Those photographs did indeed provide a fair probability that the search would reveal evidence of possession of child pornography on Armstrong's computers, and thus Officer Vandegriff, the officer who applied for the last two warrants, is protected by qualified immunity.[48]

Under *Messerschmidt*, we must reverse. Officer Asselin and the five other officers demonstrated their entitlement to the *Messerschmidt* "shield of immunity" from suit. The claims against them ought to have been dismissed.[49]

**REVERSED** and **REMANDED** for dismissal.

---

[48] As to the remaining four officers, Thomas, Rohwer, Gilmour, and Parker, Armstrong argued in his motion opposing summary judgment that they "knew" they were violating his Fourth Amendment rights. But Armstrong failed to produce any evidence supporting these bare conclusions. The district court should have granted the motion for summary judgment as to these officers.

[49] In his pro se brief, Armstrong makes various other arguments, such as that the location where he worked was outside the municipal boundaries, but these arguments lack merit or do not bear on the qualified immunity issue.