UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven Paul GOMEZ, Defendant–
Appellant.

No. 94–10520.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 12, 1995.

Decided April 11, 1996.

As Amended on Denial of Rehearing
July 26, 1996.

Robert M. Holley, Sacramento, California, for defendant-appellant Steven Paul Gomez.

Nancy L. Simpson, Assistant United States Attorney, Sacramento, California, for plaintiff-appellee United States of America.

## ORDER

The opinion in this case is amended by adding the following two concurrences. Except as noted above, the petition for rehearing is DENIED.

Before: HALL, KOZINSKI and HAWKINS, Circuit Judges.

## OPINION

KOZINSKI, Circuit Judge.

This case gives fresh meaning to the phrase, "I'm from the government and I'm here to help you."

### I

The facts alleged by the defendant, Steven Paul Gomez, are troubling.[1] In late February or early March of 1992, Gomez was being held in the Sacramento County Jail on state-law charges when he learned from his attorney that he had been acquitted. After Gomez told his fellow inmates the good news, one of them asked whether this meant he would be released. Gomez said yes, and the other inmate, a man by the name of Imran Mir, offered him a job. Mir was charged with participating in an international drug conspiracy and wanted Gomez to kill six witnesses who were going to testify against him.[2] Mir offered Gomez $10,000 or half a kilogram of heroin for each witness he managed to knock off.

Gomez promptly reported Mir's offer to the jail guards. He did so out of a sense of moral obligation, expecting no reward. The customs agent who had been working on Mir's drug case was notified and eventually got in touch with Gomez. After the agent promised to keep Gomez's identity secret and protect him if his identity were revealed, Gomez agreed to help the government gather evidence against Mir.

Gomez then pretended to accept Mir's offer. The two communicated by written note, by telephone and through a female intermediary (actually an undercover customs agent) who would visit Mir in jail by posing as a friend. Mir was nothing if not thorough: He gave Gomez the names, addresses and physical descriptions of the witnesses; in most

1. The district court assumed that all of Gomez's allegations were true, as do we. *See United States v. Bailey,* 444 U.S. 394, 415, 100 S.Ct. 624, 637, 62 L.Ed.2d 575 (1980) ("But precisely because a defendant is entitled to have the credibility of his testimony, or that of witnesses called on his behalf, judged by the jury, it is essential that the testimony given or proffered meet a minimum standard as to each element of the defense, so that, if a jury finds it to be true, it would support an affirmative defense."); *United States v. Lemon,* 824 F.2d 763, 764–65 (9th Cir.1987).

2. While Mir at first mentioned only three targets, he later gave Gomez a hit list with six names on it. Mir was eventually charged with solicitation to commit murder and convicted of the lesser included offense of solicitation to commit a crime of violence.

cases, he provided directions to their homes and described their cars; he promised to obtain weapons for Gomez and had $1,000 sent to him as a down payment. Gomez worked with government agents for about three months, helping them gather substantial evidence incriminating Mir. A parole report noted, "without [Gomez] U.S. Customs would have lost the case."

Once the government thought it had enough evidence against Mir, it gave Gomez $2,500 and sent him on his way. The next day, the United States filed an indictment charging Mir with five counts of solicitation to commit murder. Although the government had used code names to keep Gomez's identity secret throughout the investigation, the indictment disclosed Gomez's full and true name.[3] The government didn't tell Gomez that his name would be revealed, but he soon found out.

Shortly after Gomez was released,[4] he began receiving death threats. On October 3, 1992, he was accosted by a man with a gun who asked him why he had cooperated with law enforcement. Gomez escaped by running into a friend's house, but the man told him this was the last time he would let Gomez go because "there's money to be made." Gomez later learned from his sister there was a contract out on his life. He went back to the federal agents and begged them to take him into protective custody; he went to the Sacramento County Sheriff; he went to his parole agent; he went to the Catholic and Episcopal churches. No one was willing or able to help him. Gomez even took his

story to a newspaper, which wrote about his plight. *See* Curt Guyette, *Running Scared,* Sacramento News & Rev., January 7, 1993, at 14–16. All to no avail.

Gomez then started running for his life. He would stay at a friend's house for a while, getting rides from people he trusted. At other times, he lived on the streets, sleeping in parks during the day, walking around at night and riding buses for hours. Gomez eventually resorted to falsely telling a parole agent he was using illegal drugs so he could see his parole officer. As a result of this lie, Gomez was sent back to jail for violating parole. About a week and a half after arriving there on December 24, he received a written death threat addressed to "Smiley," the name by which Mir knew him. Gomez was released on January 23, 1993, and on February 2, one of his friends received a telephone death threat meant for Gomez. In fear for his life and not knowing what else to do, Gomez made a fateful decision: He took possession of a twelve-gauge shotgun that had been stored at a friend's house.

Right about that time, the federal government suddenly decided it needed Gomez's further help after all. On February 4, 1993, two customs agents went to serve Gomez with a subpoena. When they finally found him at a friend's house, Gomez was carrying the shotgun. The agents drew their side arms and ordered Gomez to put up his hands. He ran into the house, threw away the shotgun and fled. The agents searched the house and found the shotgun. Gomez

---

**3.** In its brief, the government claims that "the use of defendant Gomez' name in the indictment was in accordance with Department of Justice pleading forms and was required by notice pleading." Appellee's Resp. Br. at 3. We are nonplused by this argument in light of the many cases we have seen where the government has successfully resisted divulging the identity of confidential informants. *See, e.g., United States v. Staufer,* 38 F.3d 1103 (9th Cir.1994); *United States v. Beltran,* 915 F.2d 487 (9th Cir.1990). The Supreme Court has stated, moreover, that the government has a "privilege to withhold from disclosure the identity of persons who furnish information of violations of law to officers charged with enforcement of that law." *Roviaro v. United States,* 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1957); *see also id.* at 67, 77 S.Ct. at 631 (Clark, J., dissenting) ("To give [in-

formants] protection governments have always followed a policy of nondisclosure of their identities.... Once an informant is known the drug traffickers are quick to retaliate. Dead men tell no tales."). The Assistant United States Attorney in our case surely knew all this since she had successfully opposed a motion seeking identification of the confidential informants in the Mir drug case. *See* Pl.'s Resp. & Opp'n to Mot. to Disclose Informant Identities (Mir Drug Trial, No. CR–S–91–00037–DFL); RT 2/27/92 Hearing at 2 (Mir Drug Trial, No. CR–S–91–00037–DFL); n.10 *infra.*

**4.** Although Gomez had been acquitted of certain state-law criminal charges, he still had time to serve for violating parole.

was arrested the next day; he had had the shotgun for two days.

## II

■ Gomez was indicted on two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1): one for the shotgun, the other for the shells in it. Gomez made a motion in limine seeking permission to introduce evidence tending to prove that his possession of the shotgun was justified. The district court denied the motion and Gomez pleaded guilty to one count, retaining the right to appeal the district court's ruling.

■ Gomez argues he should have been allowed to present the death threat evidence in order to make out either a duress or necessity defense. In this and other circuits, however, cases such as Gomez's have almost always been analyzed in terms of justification.[5] See United States v. Sahakian, 965 F.2d 740, 741 (9th Cir.1992); United States v. Paolello, 951 F.2d 537, 540–41 (3d Cir.1991); United States v. Singleton, 902 F.2d 471, 472–73 (6th Cir.), cert. denied, 498 U.S. 872, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990); United States v. Stover, 822 F.2d 48, 49–50 (8th Cir.1987). We therefore review Gomez's evi-

dence to determine whether it is sufficient to make out a case of justification.[6]

The government points to United States v. Nolan, 700 F.2d 479, 484 (9th Cir.), cert. denied, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983), and Paolello, 951 F.2d at 541–42, implying that the justification defense is not available in felon-in-possession cases. See Appellee's Br. at 16 ("As explained by this Court in United States v. Nolan, ... federal firearms laws impose something approaching absolute liability."); see also id. at 20–21. Nolan and Paolello, however, did not go quite so far. See Nolan, 700 F.2d at 484 ("Rather than rule that self defense is never available, courts have generally ruled that the defendant has not pleaded facts sufficient to raise the defense."); Paolello, 951 F.2d at 541 ("Nonetheless, the courts of appeals, including this court, have recognized that the justification defense is available under this statute."); see also United States v. Panter, 688 F.2d 268, 271 (5th Cir.1982) ("We do not believe that Congress intended to make ex-felons helpless targets for assassins."). In fact, in Paolello, the Third Circuit reversed the conviction because the district court had refused to instruct the jury on the justification defense. 951 F.2d at 542–44.[7]

---

**5.** We note, however, that the three defenses are closely related. See, e.g., United States v. Paolello, 951 F.2d 537, 540 (3d Cir.1991) ("While the defenses of justification and duress were at one time distinct ... '[m]odern cases have tended to blur the distinction between duress and necessity.'") (quoting Bailey, 444 U.S. at 410, 100 S.Ct. at 634).

**6.** While Gomez doesn't phrase his argument in terms of justification, this may be due to an ambiguity in the law. We have treated the three defenses separately even though necessity was traditionally a branch of justification. See United States v. Richardson, 588 F.2d 1235, 1239 (9th Cir.1978), cert. denied, 440 U.S. 947, 99 S.Ct. 1426, 59 L.Ed.2d 636 (1979) ("On these facts they invoke the defense of necessity or 'choice of evils,' traditionally a branch of the common-law doctrine of justification."); Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 5.4 (1986) (placing "Necessity" subsection in "Justification and Excuse" section). It's clear, moreover, that Gomez meant to invoke the justification defense: In the section of his opening brief discussing necessity, he quotes the requirements for the justification defense from an oft-cited justification case and uses the words "justi-

fication" and "necessity" interchangeably. See Appellant's Opening Br. at 16–17 (quoting Lemon, 824 F.2d at 765). Nor was the government prejudiced: Its own brief discusses the justification defense in detail. See Appellee's Resp. Br. at 19–27; cf. United States v. Vacant Land Located at 10th St. and Challenger Way in Palmdale, CA., 15 F.3d 128, 131 (9th Cir.1993) ("Normally we do not consider issues not raised in the appellant's opening brief; however, we have discretion to review an issue not raised by the appellant when it is addressed in the appellee's brief.").

**7.** Indeed, 18 U.S.C. § 922(g)(1) might not pass constitutional muster were it not subject to a justification defense. The Second Amendment embodies the right to defend oneself and one's home against physical attack. Nelson Lund, The Second Amendment, Political Liberty, and the Right to Self-Preservation, 39 Ala. L.Rev. 103, 117–120, 130 (1987) (Second Amendment guarantees right to means of self-defense); see Sanford Levinson, The Embarrassing Second Amendment, 99 Yale L.J. 637, 645–46 (1989) ("[I]t seems tendentious to reject out of hand the argument that one purpose of the [Second] Amendment was to recognize an individual's right to

■ Thus, if the evidence, when viewed in the light most favorable to Gomez, was adequate to make out a justification defense, he was entitled to present it and have the jury instructed accordingly. *See United States v. Lemon,* 824 F.2d 763, 764–65 (9th Cir.1987); *Sahakian,* 965 F.2d at 741 (district court did not err in excluding defendant's offer of proof where evidence was inadequate to make out justification defense). The defendant must establish four elements in order to make out a justification defense:

> (1) he was under unlawful and present threat of death or serious bodily injury; (2) he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct; (3) he had no reasonable legal alternative; and (4) there was a direct causal relationship between the criminal action and the avoidance of the threatened harm.

*Lemon,* 824 F.2d at 765. We consider whether Gomez made this showing.

### A. Was There An Unlawful and Present Threat of Death or Serious Bodily Injury?

■ There's no dispute that the threat against Gomez was unlawful or that, if carried out, it would have caused him death or serious bodily injury. The district judge, however, held that the danger was not immediate enough because no one was holding a gun to the defendant's head, most of the threats were received over the phone or through other people, and all were two or more days old.[8]

We have reached the opposite conclusion on similar facts. In *United States v. Contento–Pachon,* 723 F.2d 691 (9th Cir.1984), defendant testified that a drug dealer named Jorge threatened to kill him and his family if he did not smuggle cocaine into the United States. Contento–Pachon swallowed balloons filled with cocaine, took a flight to the United States and was arrested here. While Contento–Pachon was told that someone would be watching him at all times, he pointed to nothing substantiating his claim. He also presented no evidence that Jorge was holding his wife and child hostage. Finally, the last threat was remote in time and place from Contento–Pachon's arrest: He was threatened in Bogota, flew out of Colombia and landed in Panama, left Panama and was finally arrested in Los Angeles. *Id.* Nonetheless, we held that the harm was immediate enough to make out a duress defense. Our reasoning is particularly apt here:

> [D]efendant was dealing with a man who was deeply involved in the exportation of illegal substances. Large sums of money were at stake and, consequently, Contento–Pachon had reason to believe that Jorge would carry out his threats. Jorge had gone to the trouble to discover that Contento–Pachon was married, that he had a child, the names of his wife and child, and the location of his residence. These were not vague threats of possible future harm. According to the defendant, if he had re-

engage in armed self-defense against criminal conduct."). In modern society, the right to armed self-defense has become attenuated as we rely almost exclusively on organized societal responses, such as the police, to protect us from harm. *See Levinson,* 99 Yale L.J. at 656 ("[O]ne can argue that the rise of a professional police force to enforce the law has made irrelevant, and perhaps even counterproductive, the continuation of a strong notion of self-help as the remedy for crime."). The possession of firearms may therefore be regulated, even prohibited, because we are "compensated" for the loss of that right by the availability of organized societal protection. The tradeoff becomes more dubious, however, when a citizen makes a particularized showing that the organs of government charged with providing that protection are unwilling or unable to do so. *See Lund,* 39 Ala. L.Rev. at 123 ("The fundamental right to self-preservation, to-

gether with the basic postulate of liberal theory that citizens only surrender their natural rights to the extent that they are recompensed with more effective political rights, requires that every gun control law be justified in terms of the law's contribution to the personal security of the entire citizenry."). At that point, the Second Amendment might trump a statute prohibiting the ownership and possession of weapons that would be perfectly constitutional under ordinary circumstances. Allowing for a meaningful justification defense ensures that 18 U.S.C. § 922(g)(1) does not collide with the Second Amendment.

**8.** The district judge was actually ruling on the sufficiency of Gomez's evidence to make out a necessity defense. He made it clear, however, that he considered the necessity and justification defenses to be the same. RT 10/6/93 Hearing at 9 (Gomez Trial, No. CR–S–93–00094–DFL).

fused to cooperate, the consequences would have been immediate and harsh. *Id.* at 694.

Gomez, too, was dealing with "a man who was deeply involved in the exportation of illegal substances." Moreover, Mir's freedom, not just his money, was at stake, and he had amply demonstrated his willingness to kill to avoid conviction by hiring Gomez himself as a hit man. And, like the drug dealer in *Contento–Pachon*, Mir had gathered substantial biographical data about his intended victims. Gomez thus faced more than just "vague threats of future harm"; he "had reason to believe that [Mir] would carry out his threats."[9] Gomez's case is, in fact, stronger than Contento–Pachon's because Mir had done much more than Jorge to show his resolve. Whereas Jorge had only gathered information and ordered Contento–Pachon followed, Mir had already given the order to murder witnesses, made all necessary arrangements and even made a down payment on a contract. And, of course, Jorge might have been entirely Contento–Pachon's invention whereas Mir's existence and murderous intentions were well known to the authorities.[10]

The unusual nature of the threat distinguishes this case from most felon-in-possession cases where a justification defense is raised. In a barroom brawl, for example, once one of the parties leaves, there is little continuing risk of harm. *See Nolan,* 700 F.2d at 484–85 (no imminent harm where allegedly threatening party leaves bar); *see also Lemon,* 824 F.2d at 765 (defendant not under present threat where soldier had left); *Stover,* 822 F.2d at 50 (defendant not in imminent danger where his debtor had left). Here it was unlikely Mir would cool off and lose interest in Gomez. Gomez had already received numerous threats over an extended period of time; that he hadn't been threatened in the last hour or the last day didn't mean the danger had abated. Mir obviously meant business.

■ The government counters that "it is not entirely clear that the last evidence of threats was connected to the defendant's cooperation against Imran Mir." Appellee's Resp. Br. at 27. The threats may have come from another source, the government suggests, pointing to Gomez's other problems with the law. This argument misses the point. It doesn't matter whether the threats were from Mir, so long as Gomez reasonably believed they were. In any event, the government is free to argue about the existence and source of the threats in presenting its case to the jury. At this stage we must give Gomez the benefit of the doubt, so long as he presents a plausible case that he thought himself in danger. He clearly does: Having been named as the finger in a murder-for-hire indictment, Gomez was hardly paranoid in fearing that the individual he betrayed to the authorities was out to get him. Under the facts alleged by Gomez, the danger was present and immediate enough to satisfy this

---

**9.** While *Contento–Pachon* was a duress case, we have already noted that the duress and justification defenses are closely related, *see* n. 5 *supra,* and both describe the immediate danger element in similar terms, *compare Contento–Pachon,* 723 F.2d at 693–94 *with Lemon,* 824 F.2d at 765.

**10.** The Assistant United States Attorney and the district judge were well aware of the danger Mir posed to informants, as both were involved in Mir's drug and murder solicitation cases. In the drug case, the prosecutor had argued that the identities of informants could not be revealed to the defendants because of "very real concerns for the safety of the informant, should this person's identity be revealed to the defendants and their friends." Pl.'s Resp. & Opp'n to Mot. to Disclose Informant Identities at 8 (Mir Drug Trial, No. CR–S–91–00037–DFL). Attached to the government's opposition to defendants' motion seeking identification of the informants was a police report stating that some officers had been verbally threatened, and an affidavit disclosing that Mir had contracted to have several hit men from Pakistan come to the United States to kill the informants. The affidavit, signed by a police officer, was based on information from both a citizen informant and a confidential reliable informant, whose identities the affiant requested "remain confidential as to reveal both sources would put them in danger." ER 33. Not surprisingly, the district judge refused to order the government to divulge the identities of the informants because "the Government's interest in the protection of its informant and the preservation of his or her confidentiality is substantial here." RT 2/27/92 Hearing at 2 (Mir Drug Trial, No. CR–S–91–00037–DFL).

element of the justification defense.[11]

### B. Did Defendant Recklessly Place Himself in A Situation Where He Would Be Forced to Engage in Criminal Conduct?

■ The government argues, and the district court held, that Gomez recklessly placed himself in a situation where he was forced to commit the crime because he told quite a few people about his cooperation with law enforcement officials. The government, however, points only to portions of the record showing that Gomez talked to the Sacramento News & Review, Father Arciniega of Saint Paul's Episcopal Church, Bishop Quinn of the Catholic Church, the Sacramento County Sheriff's office and Gomez's friend Patricia Ramos. The newspaper article did not include Gomez's name; even if Mir had managed to get a copy, it would not have disclosed Gomez's identity. Nor can Gomez be faulted for explaining his predicament to those whose help he was seeking. Most important, all of Gomez's disclosures came after the government had spilled the beans by putting his name in Mir's murder-for-hire indictment.

The government's attempt to downplay its own responsibility rings hollow:

Up to the time of the events underlying the present prosecution, *a mere two documents* had been filed in federal court reflecting the historical facts of defendant Gomez' cooperation: the indictment in the solicitation case and the declaration concerning whether defendant Gomez was working for law enforcement officers at the time of the initial solicitation.

Appellee's Resp. Br. at 18 (emphasis added). We find nothing "mere" about revealing Gomez's identity in an indictment accusing Mir

of soliciting the murder of witnesses. The government's argument reminds us of a well-known definition of chutzpah. *See* 103 Yale L.J. at 467.

### C. Was There A Reasonable Legal Alternative?

■ Gomez didn't rush out to arm himself as soon as he realized his life was in danger; he tried many other avenues first. Unlike a lot of defendants, Gomez went to the authorities seeking protection. *See e.g., Lemon,* 824 F.2d at 765. He asked the Customs Service to honor its promise to protect him. *See In re Grand Jury Proceedings,* 652 F.2d 413, 414 (5th Cir. Unit A 1981) (accepting offer of government protection is a reasonable alternative to committing crime). He asked the Sacramento County Sheriff for help. He went to his parole officer. He went to two churches.

The government argues that Gomez could have left the state and joined his wife and child in Texas. However, he was on probation and could not lawfully leave California. *See* Cal.Penal Code § 1203(i). While probationers may be released to other states, *see* Cal.Penal Code § 11175 et seq., Gomez claims the state authorities hadn't acted on his request to leave California, and the government confirmed this at oral argument. Furthermore, we doubt the utility of moving to Texas, which would have required Gomez to give up the local network of family and friends who were helping him hide.[12] And, given Mir's obvious resourcefulness, he might well have caught up with Gomez in Texas, putting his wife and child in danger. The government has not suggested what else Gomez might have done to protect himself. If Gomez's story is believed, he was privileged to arm himself because "a history of futile attempts revealed the illusionary bene-

11. The government places great reliance on *United States v. Sahakian,* 965 F.2d 740. In *Sahakian* we held that the defendant did not prove there was an immediate and present threat because the assault which alerted him of the danger had taken place 36 days prior to his possession of the gun. *Id.* at 741. We fail to see what comfort the government derives from *Sahakian.* The defendant there had received a single threat more than a month before he was arrested. Gomez had received a series of threats, the last only two days before the customs agents found him.

Gomez, moreover, was dealing with someone who the government has admitted is a danger to informants. *See* n. 10 *supra. Sahakian,* by its very contrast, helps Gomez.

12. The district court also noted that Gomez could have moved to another area of California. This would likewise have required Gomez to give up his local network without any guarantee that .he would be able to elude Mir.

fits of the alternatives." *Lemon*, 824 F.2d at 765 (internal quotation marks omitted).

### D. Was There a Direct Causal Relationship Between the Criminal Action and the Avoidance of the Threatened Harm?

■ The district court found that "there was not a direct causal relationship between the criminal action and the avoidance of the threatened harm. It was attenuated by time, it was at least two days, and again by distance." SER 84. We are at a loss to understand the district court's thinking. According to Gomez, he had been chased by a man wielding a gun and subjected to a series of threats, the last shortly before he took possession of the shotgun. Furthermore, there is no evidence that he had the shotgun for any purpose other than to protect himself. When Gomez saw the two customs agents coming for him, he ran away and dropped the gun. This is not "the type of case where a felon arm[ed] himself . . . and [went] looking for trouble." *Newcomb*, 6 F.3d at 1136 (internal quotation marks omitted).

The government also cites *Singleton*, 902 F.2d at 472–73, and *Stover*, 822 F.2d at 50, for the proposition that a defendant who is justified in possessing the gun in the first place must nonetheless discard it as soon as he may safely do so. But if Gomez's story is believed, there *was* no time before his arrest when he could have safely dumped the shotgun, as there was no clear cessation in the string of threats he received.

### III

While some of the facts Gomez alleges are in dispute, much of his story is supported by the record here and in the cases against the indomitable Imran Mir. What seems particularly clear—and very troubling—is that the United States Government identified Gomez as a witness in Mir's murder-for-hire indictment even as it was charging Mir with trying to murder witnesses in other cases. That Gomez approached the government with the information which formed the basis of Mir's wrath against him, and did so without compulsion or hope of remuneration, speaks well for Gomez and not nearly so well for those in the government who betrayed his trust.[13] To prosecute Gomez for trying to protect himself, when the government refused to protect him from the consequences of its own indiscretion, is not what we would expect from a fair-minded sovereign.

Be that as it may. Having found Gomez, a convicted felon, in possession of a gun, the government was entitled to go after him. At the same time, Gomez was entitled to tell the jury his side of the story. His evidence, if believed, sufficed to make out a justification defense. It should have been admitted.

■ Unfortunately, Gomez has already served most of his sentence and, we are told, is scheduled to be released on June 8, 1996. Because it appears unlikely that he could be retried before his sentence expires, failure to release Gomez pending retrial would deprive him of meaningful relief. *Cf. United States v. Enriquez–Munoz*, 906 F.2d 1356, 1358 (9th Cir.1990) (upon vacating defendant's sentence, court ordered defendant released immediately in order to avoid prolonging incarceration pending resentencing). We therefore vacate Gomez's conviction and remand with directions that the district court release him immediately, subject only to appropriate conditions to ensure his availability in case of retrial. The mandate shall issue forthwith. Fed. R.App. P. 2.

**VACATED** and **REMANDED**.

HALL, Circuit Judge, concurring:

I concur in Judge Kozinski's opinion, with the exception of footnote 7, which I do not join because it directly conflicts with our holding in *Hickman v. Block*, 81 F.3d 98, 101

---

13. The government quibbles that it never promised Gomez confidentiality as a condition for his cooperation. At this stage we must, of course, accept Gomez's version of the events but, as a matter of fairness and justice, we don't see why it matters. Let's say Gomez lacked the foresight to extract a promise of confidentiality from the government before disclosing his information and helping it obtain more. Does the government then have no moral obligation to avoid unnecessary harm to one of its citizens, particularly one who has stepped forward to help prevent harm to others?

(9th Cir.1996) (holding that "the Second Amendment is a right held by the states, and does not protect the possession of a weapon by a private citizen").

HAWKINS, Circuit Judge, concurring:

I concur in all of Judge Kozinski's excellent opinion save for footnote 7, which alludes to an interesting and difficult question I would leave for another day.