**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. TRAVIS SHANE BARNES, *Defendant-Appellant.* | No. 16-30203 D.C. No. 1:15-cr-02061-LRS-1 OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Submitted February 9, 2018[*]
Seattle, Washington

Filed July 19, 2018

Before: Ronald M. Gould, Richard A. Paez,
and Morgan Christen, Circuit Judges.

Opinion by Judge Paez

---

[*] The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY**

### Criminal Law

The panel affirmed a conviction for being a felon in possession of a firearm, in a case in which the defendant argued that the district court erred (1) by denying his motion to suppress evidence based on an allegedly invalid arrest warrant and (2) by precluding the defendant from presenting a necessity defense.

The panel held that the district court's finding that the municipal judge who signed the defendant's arrest warrant must have reviewed the underlying citation as part of her "ordinary course of business" was clearly erroneous, where there is no record evidence that the municipal court judge either received or read a copy of the citation prior to her finding of probable cause. The panel therefore concluded that the warrant for the defendant's arrest for the underlying trip permit violation was inexcusably infirm and that the defendant therefore satisfied his burden of showing judicial abandonment by a preponderance of the evidence.

The panel held that the good faith exception to the exclusionary rule applies *unless* a defendant can show that the issuing judge abandoned his or her role *and* that the law enforcement officer knew or should have known of such abandonment. The panel concluded that although the defendant met his burden of showing judicial abandonment, the evidence cannot be suppressed because the officers

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

executing the infirm warrant were unaware—and had no reason to be aware—of any judicial misconduct.

The panel held that the district court did not err in denying the defendant's request to present a necessity defense to the jury.

## COUNSEL

Nicolas V. Vieth, Vieth Law Offices Chtd., Coeur d'Alene, Idaho, for Defendant-Appellant.

Thomas J. Hanlon, Assistant United States Attorney; Joseph H. Harrington, United States Attorney; United States Attorney's Office, Yakima, Washington; for Plaintiff-Appellee.

## OPINION

PAEZ, Circuit Judge:

Travis Barnes appeals his conviction under 18 U.S.C. § 922 for being a felon in possession of a firearm. He argues that the district court erred in two respects: first, by denying his motion to suppress evidence based on an allegedly invalid arrest warrant; and second, by precluding him from presenting a necessity defense at trial. We have jurisdiction under 28 U.S.C § 1291, and we affirm.

Although the underlying warrant for Barnes's arrest was the product of judicial abandonment, we apply the good faith exception to the exclusionary rule and affirm the district court's denial of his motion to suppress evidence. We also

conclude that the district court properly barred Barnes's necessity defense because he failed to adequately demonstrate that he took possession of the gun in response to an imminent threat of death or bodily injury.

## I.

On August 17, 2015, a Yakima Police Department ("YPD") officer told fellow Officers Thomas Tovar and J. Cordova to keep an eye out during patrol for two wanted men in the area, Travis Barnes and his son Raymond Barnes ("Raymond"). Officers Tovar and Cordova consulted their mobile data terminal, confirmed that there were outstanding warrants for both men, and viewed several photographs of Barnes and his son to get a sense of their general appearance. A little over half an hour later, the officers saw Barnes walking along a street, having recognized him by his distinctive neck tattoo. Officer Tovar exited his vehicle and informed Barnes that there was a warrant for his arrest. Although Barnes was initially cooperative and complied with Officer Tovar's request to put his hands behind his back, he took off running after he was mistakenly informed by Officer Cordova that he was wanted on a "DOC felony warrant." In truth, the felony warrant was for his son, Raymond. There was, however, a misdemeanor bench warrant for Barnes that was based on his failure to appear for arraignment for an alleged trip permit violation[1] some six months earlier.

---

[1] A trip permit, or temporary license permit, allows a vehicle owner to drive their otherwise unlicensed vehicle on public roadways for three consecutive days. *See* Wash. Rev. Code § 46.16A.320(1)(a), (3). A trip permit violation is a gross misdemeanor. *See id.* § 46.16A.320(6).

The officers ordered Barnes to stop, to no effect, and gave chase.  Deputy Marshal C. Smith, who was in the area investigating a robbery and had observed Barnes's interaction with Officers Tovar and Cordova, quickly realized that Barnes was running in his direction.  Deputy Smith exited his vehicle and instructed Barnes to stop. When Barnes failed to comply, Deputy Smith tased him in the back, knocking Barnes down.  Officers Tovar and Cordova caught up seconds later.  Together, the officers handcuffed Barnes's hands behind his back and searched his person, eventually recovering a small .22 caliber, silver pistol from his front right pocket.

Having previously been convicted of a felony, Barnes was arrested and taken into custody.  He was subsequently charged in federal court with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).  Barnes filed a motion to suppress evidence before trial, arguing that his arrest was unlawful for a variety of reasons, only one of which he reasserts on appeal: that the arrest warrant for his failure to appear on the trip permit violation was not supported by probable cause.[2]  The government responded to Barnes's motion to suppress evidence by including in its opposition a copy of the criminal complaint prepared by a

---

[2] A bench warrant for failing to appear at a scheduled hearing is invalid if there was no finding of "probable cause to support the underlying offense."  *State v. Parks*, 148 P.3d 1098, 1099 (Wash. Ct. App. 2006); *cf. United States v. Gooch*, 506 F.3d 1156, 1160 n.3 (9th Cir. 2007) (acknowledging that under *Parks*, a bench warrant issued for failure to appear is "insufficient where there had never been a prior finding of probable cause to arrest the defendant at any time in the proceedings."). Failure to appear in response to a mailed summons is not a separate criminal offense under Washington law. *See Parks*, 148 P.3d at 1101 ("[F]ailure to appear is not a crime."); *see also State v. Walker*, 999 P.2d 1296, 1299 (Wash. Ct. App. 2000) (same).

city prosecutor for Barnes's alleged trip violation. The complaint, dated February 9, 2015, included a stamp where the reviewing judge had circled "Yes" to "Probable Cause" and signed with her initials on February 13, 2015. The government argued that the signed complaint evidenced that the misdemeanor arrest warrant was based on a valid judicial determination of probable cause.

At an evidentiary hearing, the government called Melissa Blackledge, a Department Assistant for the Yakima Municipal Court Clerk's Office, to testify. Blackledge testified that although she was not normally involved in processing criminal complaints, she was familiar with the process. She explained that once the Yakima Municipal Court received a ticket or citation, a prosecutor would "send[] down a complaint" for a clerk to stamp with "probable cause" and "yes" and "no" responses. The reviewing judge would then circle either "yes" or "no" to probable cause, sign or initial her name, and send the complaint back to the clerk to print out a summons. Blackledge testified on cross-examination that although the prosecutor would forward the complaint for the judge's review, she never saw the prosecutors include a police report with the complaint. When asked whether the prosecutors would submit an affidavit with the complaint, Blackledge—who had been with the court for six and a half years—answered that she wasn't sure what an affidavit was and that she would "have to say no." On re-direct, Blackledge testified that the municipal court judges did not issue separate orders finding probable cause, but rather denoted their findings of probable cause on the criminal complaint itself.

After hearing from the government's witnesses and Barnes, the district court denied Barnes's motion to

suppress. The court did so in part because it assumed, without evidence, that the municipal court judge "in the ordinary course of business would have reviewed [the arresting officer's] citation containing his certification under oath." The court explained that because it had been the law "[f]or forty years . . . that a judicial determination of probable cause may not be based on a prosecutor's assessment of probable cause standing alone," it was "extremely difficult to fathom that a Yakima Municipal Court Judge would make a determination of probable cause based solely on a complaint presented by the prosecutor and without reviewing the citation giving rise to the complaint."

The court added that because Officers Cordova and Tovar had acted in good faith reliance on the outstanding bench warrant, the good faith exception to the exclusionary rule was applicable unless one of the four *United States v. Leon*, 468 U.S. 897, 922–23 (1984) exceptions to the good faith exception applied. Unpersuaded that the facts of the case implicated any of the four *Leon* exceptions, including judicial abandonment, the court applied the good faith exception to the exclusionary rule and denied Barnes's motion to suppress. In so doing, the court noted that "suppression of the evidence in this instance would not deter future police misconduct."

Following the district court's ruling, the parties submitted jointly proposed jury instructions and a verdict form for the court's review. The proposed jury instructions did not include instructions on a necessity defense. Five days before the jury trial, however, counsel for Barnes sent the government a copy of a news article describing close to two dozen instances of small children accidentally shooting themselves or others with unattended firearms. Counsel explained in a letter that it was possible he would introduce

the article during trial.  Based on the letter and news article, the government surmised that Barnes would attempt to raise a necessity defense and filed a motion in limine to preclude any such defense.  The government's assessment proved correct: Barnes submitted a proposed jury instruction for a necessity defense on the first day of trial.

During a hearing on the proposed defense, the court requested that counsel for Barnes make an offer of proof. Counsel for Barnes explained that Barnes had been arrested by Officers Cordova and Tovar while en route to a nearby dumpster to dispose of the gun for safety reasons.

According to trial counsel, Barnes woke up in the afternoon after caring for Raymond, who was addicted to methamphetamine.  When he went to do his son's laundry, Barnes realized that there were multiple strangers in the house, including two children around the ages of two to three years old and two adults, the latter of whom were "passed out."  In the laundry area of Raymond's residence, there was a special "cubbyhole" behind a refrigerator used to conceal people from law enforcement.  Barnes noticed that the refrigerator had been moved and that the hiding spot was exposed.  As he went to push the refrigerator back into place, Barnes allegedly heard something fall to the ground.  Shortly thereafter, he saw a gun on the floor.  Concerned that the children, who were awake, would somehow gain possession of the gun and injure themselves or someone else, Barnes made a split-second decision to take the gun and dispose of it. Barnes was arrested in the middle of his walk to a nearby dumpster.

The district court concluded that Barnes's offer of proof did not meet the requirements for a necessity or justification defense.  In particular, the district court determined that the proffered evidence fell short of showing that Barnes was

responding to an "immediate threat of death or threat of bodily injury" or that Barnes had no reasonable legal alternative available.  Relying on the same reasoning, the court later denied Barnes's renewed request to present a necessity defense following the government's presentation of its case as well as his motion for reconsideration.

The jury convicted Barnes of being a felon in possession of a firearm.  Barnes was sentenced to 41 months' imprisonment followed by three years of supervised release. He timely appealed.

## II.

We review a "district court's rulings on motions to suppress," including applications of the good faith exception to the exclusionary rule, "and the validity of search warrants *de novo*."  *United States v. Underwood*, 725 F.3d 1076, 1081 (9th Cir. 2013).  We review the court's factual findings for clear error.  *See United States v. Grandberry*, 730 F.3d 968, 970–71 (9th Cir. 2013).  We review *de novo* a district court's decision to bar a necessity defense.  *See United States v. Schoon*, 971 F.2d 193, 195 (9th Cir. 1991).

## III.

### A.  *Validity of the Arrest Warrant*

We address first the district court's assumption that the municipal court judge must have reviewed the arresting officer's sworn citation before finding probable cause because it would be "extremely difficult to fathom" otherwise.  We understand the district court's reluctance to consider that a municipal court judge would disregard decades of precedent establishing that judges may not rely on a prosecutor's complaint alone to find probable cause.

*See Gerstein v. Pugh*, 420 U.S. 103, 114–19 (1975); *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 564–65 (1971) (concluding that a complaint "alone could not support the independent judgment of a disinterested magistrate"). We are not, however, at liberty to substitute our assumptions for evidence in the record. Moreover, as the Supreme Court has recognized, judicial determinations of probable cause may not always adhere to the tenets of constitutional law. *See Leon*, 468 U.S. at 916 n.14 (acknowledging that "there are assertions that some magistrates become rubber stamps for the police and others may be unable effectively to screen police conduct"); *see also State v. Hoffman*, 25 N.E.3d 993, 1001 (Ohio 2014) ("It is clear from the testimony and documentary evidence offered at the suppression hearing that Hoffman's misdemeanor warrants were issued without a probable-cause determination"); *Stewart v. State*, 711 S.W.2d 787, 788 (Ark. 1986) (adopting *Leon* and concluding that the "conduct of Judge Bridgforth was inexcusable" because he signed blank arrest warrants without reviewing officer affidavits or making a judicial determination of probable cause).

The district court's assumption that the municipal court judge must have relied on something other than the prosecutor's complaint is unsupported by the record and does not present a "permissible view[] of the evidence." *United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003). There was no testimony at the suppression hearing that Yakima Municipal Court judges were provided with, separately retrieved, or were even *able* to separately retrieve—much less that they read—the citations and officer reports underlying the criminal complaints as part of their ordinary course of business. To the contrary, the only court employee to testify at the suppression hearing explained that prosecutors regularly submitted complaints for probable

cause determinations without attaching police reports or affidavits. Blackledge testified that she was not sure what an affidavit was. Furthermore, it was the practice of Yakima Municipal Court judges to record their probable cause determinations on the criminal complaint itself without issuing a separate order.

We recognize that the criminal complaint provided the citation number for Barnes's alleged trip permit violation. It is therefore theoretically possible that the reviewing judge could have separately looked up the citation number, retrieved the arresting officer's sworn statements, and made a proper determination of probable cause. Factual findings, however, must be rooted in evidence as opposed to speculation. *See Guam Soc'y of Obstetricians & Gynecologists v. Ada*, 100 F.3d 691, 698 (9th Cir. 1996) ("[A]s judges, we are not permitted to engage in such speculation. We are confined to the evidence in the record and those inferences that directly follow from that evidence."). Here, there is no evidence that the reviewing judge ever retrieved a copy of the criminal complaint— whether in this case or in others. When trial counsel for Barnes requested from Yakima Municipal Court a copy of the order finding probable cause and all documents relied on by the judge to find probable cause, he received a copy of the complaint, an order of dismissal, and a copy of the docket. He did not receive a copy of the criminal citation.

The government attempts to fill this evidentiary gap by arguing that because the criminal complaint was filed in Yakima Municipal Court, the reviewing judge must have received it. This argument suffers from two critical flaws: first, whether the reviewing judge actually receives an officer's citation is separate from the filing of the citation with the court; and second, the judge's receipt of the citation

is altogether different from the judge's review of it. Notably, the government never claims in its brief that the municipal court judge read or otherwise reviewed the citation. Nor, for that matter, could the government credibly advance such an interpretation of the evidence.

At best, the record establishes that the Yakima Municipal Court received an electronic copy of the citation for Barnes's alleged trip permit violation on February 9, 2015. The citation included the arresting officer's sworn statement regarding the incident. From there, a prosecutor prepared a misdemeanor criminal complaint based on the citation. A clerk in the court then stamped the complaint with "probable cause" with "yes" and "no" markings and forwarded the complaint to the judge for review. Neither the clerk nor the prosecutor provided the reviewing judge with a copy of the citation and/or the officer's sworn report. The reviewing judge then circled "yes" to probable cause on February 13, 2015 and signed her initials. Later, a court clerk prepared a summons for Barnes, directing him to appear for arraignment. When Barnes failed to do so, the court issued a bench warrant for his arrest.

On these facts, the district court's finding that the municipal court judge must have reviewed the citation as part of her "ordinary course of business," was clearly erroneous. There is no record evidence that the municipal court judge either received or read a copy of the citation prior to her finding of probable cause. We therefore conclude that the warrant for Barnes's arrest for the underlying alleged trip permit violation was inexcusably infirm and that he has satisfied his burden of showing judicial abandonment by a preponderance of the evidence. *See United States v. Jordan*, 291 F.3d 1091, 1100 (9th Cir. 2002) (explaining that a defendant must first make a "substantial preliminary

showing, by a preponderance of the evidence," that the warrant was infirm in order to prevail on a motion to suppress); *United States v. Decker*, 956 F.2d 773, 777 (8th Cir. 1992) (affirming the district court's decision to suppress evidence because the state judge's failure to read the search warrants before signing them rendered both warrants defective).

## B. *Good Faith Exception to the Exclusionary Rule*

Ordinarily, the exclusionary rule—a "judicially created remedy designed to safeguard Fourth Amendment rights"— would operate to preclude "the use of evidence obtained in violation" of the Fourth Amendment. *See Leon*, 468 U.S. at 906. The Supreme Court, however, recognized in *Leon* a "good-faith exception" to the exclusionary rule. *Id.* at 924. Under this exception, "evidence obtained in objectively reasonable reliance on a subsequently invalidated . . . warrant" is not subject to suppression. *Id.* at 922. In short, evidence obtained pursuant to a constitutionally infirm warrant may nonetheless be admitted so long as the officers acting on the search or arrest warrant were unaware of—and had no reason to be aware of—the warrant's infirmities.

The good faith exception, however, is not without its own exceptions. The Court in *Leon* "identified four situations that *per se* fail to satisfy the good faith exception," because "the officer will have no reasonable grounds for believing that the warrant was properly issued." *Underwood*, 725 F.3d at 1085 (quoting *Leon*, 468 U.S. at 922–23). Three of the four situations focus on warrants with defects that should be immediately apparent to law enforcement officials, such as warrants that are "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," warrants resulting from recklessly or knowingly misleading the issuing judge, or warrants that are

the product of "bare bones affidavits." *Id.* (quoting *Leon*, 468 U.S. at 922–23). The fourth situation is "where the judge 'wholly abandons his or her judicial role.'" *Id.* (quoting *Leon*, 468 U.S. at 923) (internal alterations omitted). This last situation serves as the basis for Barnes's appeal.

Barnes argues that the good faith exception is inapplicable in this instance because the municipal court judge wholly abandoned her judicial role by relying solely on the prosecutor's complaint to find probable cause. Although we agree with Barnes that the record does not suggest that there was judicial review in this instance, we join our sister circuits in concluding that the good faith exception nonetheless applies *unless* a defendant can show that the issuing judge abandoned his or her judicial role *and* that the law enforcement officers knew or should have known of such abandonment.

The Supreme Court did not provide a clear definition of judicial abandonment in *Leon*. Instead, the Court cautioned against deferring to magistrates when they have failed to perform their "neutral and detached" function by rubber-stamping arrest or search warrants for the police. *Leon*, 468 U.S. at 914. The Court also cited *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 (1979) as an example of judicial abandonment and explained that judicial officers who fail to act with the requisite "neutrality and detachment . . . cannot provide valid authorization for an otherwise unconstitutional search." *Leon*, 468 U.S. at 914, 923. *Lo-Ji Sales* was an extreme case where the judicial officer "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation." 442 U.S. at 327. Rather than simply sign the warrant authorizing a search of an adult bookstore, the judicial officer accompanied law

enforcement officials to the store, where he viewed snippets of over twenty films and leafed through multiple magazines. *Id.* at 322–23. After determining that the films and magazines were obscene, he instructed the officers to seize any similar items without providing guidance on what constituted a "similar" item. *Id.* at 327.

We do not think the Supreme Court intended to limit judicial abandonment to conduct such as that in *Lo-Ji Sales* and other instances of judicial bias. Our reading of *Leon* is consistent with the Court's decision in *Aguilar v. Texas*, 378 U.S. 108 (1964), *abrogated on different grounds by Illinois v. Gates*, 462 U.S. 213 (1983). There, the Court concluded that prior to making a probable cause determination, a magistrate "*must* be informed of some of the underlying circumstances" supporting an officer's reliance on an informant tip. *Aguilar*, 378 U.S. at 114 (emphasis added). Otherwise, the magistrate cannot be said to have acted as a "neutral and detached magistrate." *Id.* at 115 (internal quotation marks omitted).

We therefore join our sister circuits in concluding that a defendant may show judicial abandonment through any one of the following ways: (1) the magistrate was biased against the defendant or otherwise personally interested in issuing the warrant; (2) the magistrate functionally occupied a different, non-neutral role while making the probable cause determination; or (3) the magistrate failed to review the requisite affidavits or materials prior to making a probable cause determination. *See, e.g.*, *United States v. Frazier*, 423 F.3d 526, 537 (6th Cir. 2005) (concluding that the record did not support the defendant's contention that the magistrate "issued the warrant without reading the affidavit" and therefore that the magistrate did not abandon his judicial role); *United States v. Koerth*, 312 F.3d 862, 869 (7th Cir.

2002) (concluding that the judge "complied with the requirement of acting as a neutral and detached magistrate" because there was no evidence that the judge had failed to read or review the affidavit before signing the warrant); *United States v. Martin*, 297 F.3d 1308, 1317 (11th Cir. 2002) ("It is clear to us that a magistrate judge should read the warrant and make his own independent assessment as to whether the warrant and its underlying affidavit contain a sufficient amount of information to support a finding of probable cause. A judge can be said to act as a mere 'rubber stamp' if he solely relies upon the fact that police officers are asking for the warrant."); *United States v. Mueller*, 902 F.2d 336, 340 (5th Cir. 1990) ("Nothing suggests that the magistrate had any bias or interest in issuing the warrant, or that he dispensed with his neutral and detached position to become involved in the evidence-gathering related to issuance of the warrant as did the town justice in *Lo-Ji Sales*."); *see also* 1 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 1.3(f) (5th ed. 2017) ("Though it is far from clear exactly what . . . falls within the [judicial abandonment] qualification in *Leon*, certainly the most likely possibility is that mentioned by the Court earlier in the *Leon* opinion: where the magistrate serves merely as a rubber stamp for the police." (internal quotation marks and footnotes omitted)).

Where, as here, there is no evidence that the reviewing judge consulted any materials other than the criminal complaint prior to issuing a finding of probable cause, the defendant has met his burden of demonstrating judicial abandonment. *See Koerth*, 312 F.3d at 869. This, however, does not end our inquiry.

The Supreme Court emphasized in *Leon* that the judicial abandonment exception to the good faith exception operates

"in such circumstances [when] no reasonably well trained officer should rely on the warrant." 468 U.S. at 923. In the decades since *Leon* was decided, the Supreme Court has continued to stress that "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *Id.* at 916. In *Arizona v. Evans*, 514 U.S. 1 (1995), the Supreme Court explained that "[w]here the exclusionary rule does not result in appreciable deterrence, then, clearly, its use is unwarranted." *Id.* at 11 (internal quotation marks and alterations omitted). Because the "exclusionary rule was historically designed as a means of deterring police misconduct, not mistakes by court employees," and there was "no basis for believing that application of the exclusionary rule in these circumstances will have a significant effect on . . . court clerks [who] are not adjuncts to the law enforcement team engaged in the often competitive enterprise of ferreting out crime," the Court concluded that "clerical errors of court employees" were categorically exempted from the exclusionary rule. *Id.* at 14–16; *see also Davis v. United States*, 564 U.S. 229, 239 (2011) (summarizing the history of the good faith exception and explaining that the doctrine arose from an understanding that "punishing the errors of judges is not the office of the exclusionary rule" (internal quotation marks and alterations omitted)); *Herring v. United States*, 555 U.S. 135, 142 (2009) (reiterating that *Evans* was based, in part, on the understanding that "[t]he exclusionary rule was crafted to curb police rather than judicial misconduct"); *Massachusetts v. Sheppard*, 468 U.S. 981, 990 (1984) (applying the good faith exception even though "[a]n error of constitutional dimensions may have been committed with respect to the issuance of the warrant," because "it was the judge, not the police officers, who made the critical mistake.").

Although this approach to the good faith exception has been the subject of considerable scholarly debate,[3] we are bound to follow the Supreme Court's directives. We therefore conclude, consistent with the Fifth, Sixth, and Tenth Circuits, that the exclusionary rule only applies if the issuing judge abandoned his or her judicial role *and* law enforcement officers knew or should have known of the abandonment. *See United States v. Villanueva*, 821 F.3d 1226, 1235 (10th Cir. 2016) (applying the good faith exception because the defendant did not "set forth any evidence or argument" that the officer "could have, or should have, reasonably known about any alleged bias the issuing judge might have had"); *United States v. Rodriguez-Suazo*, 346 F.3d 637, 649 (6th Cir. 2003) ("Because the focus of this [exclusionary] rule is to prevent police misconduct, exclusion should be ordered only if the police officer knew . . . that the magistrate abandoned his or her neutral and detached function."); *United States v. Breckenridge*, 782 F.2d 1317, 1321–22 (5th Cir. 1986) (declining to suppress the evidence because the judge appeared to both officers to have "fulfilled his duty to act as a 'neutral and detached' magistrate"); *see also* LaFave, *supra*, at § 1.3(f)

---

[3] *Leon*'s conceptualization of the good faith exception to the exclusionary rule was predicated in part on the Court's skepticism that ineffective or lawless magistrates was a "problem of major proportions." 468 U.S. at 916 n.14. The Court also emphasized that the threat of the exclusionary rule could not "be expected significantly to deter" judicial officers the same way as it would law enforcement. *Id.* at 917. Following *Leon*, some scholars noted that the "new rule [would] produce a net gain for privacy and the fourth amendment . . . [but] only if magistrates do what the Supreme Court expects of them and inquire responsibly into the issue of probable cause." Abraham S. Goldstein, *The Search Warrant, the Magistrate, and Judicial Review*, 62 N.Y.U. L. Rev. 1173, 1177 (1987). We expect, as the *Leon* Court did, that magistrate judges will uphold their obligations to independently examine proposed warrants for probable cause.

("*Leon* recognizes only deterrence of the police . . . and this means that the circumstances showing the magistrate has 'wholly abandoned his judicial role' must have been known by (or at least reasonably knowable by) the police.").

There is no evidence that Officers Cordova and Tovar knew or should have known that the arrest warrant was infirm, whether in this particular instance or as part of a broader Yakima Municipal Court practice. Furthermore, neither officer was present when the reviewing judge made her determination. Although these are not the only methods by which Barnes—or any other defendant—can demonstrate officer knowledge, we note that there is nothing in the record to support an inference that the officers were aware of any judicial misconduct. Accordingly, we conclude that the officers acted in good faith reliance on the bench warrant and that the district court properly denied Barnes's motion to suppress.

## IV.

Barnes next argues that the district court erred when it denied his request to present a necessity defense to the jury. A defendant is entitled to present evidence on a necessity defense and have the jury instructed accordingly once he has adequately established—through an offer of proof—that all four requisite factors are met: (1) he was "faced with a choice of evils and chose the lesser evil"; (2) he "acted to prevent imminent harm"; (3) he "reasonably anticipated a causal relation between his conduct and the harm to be avoided"; and (4) there were "no other legal alternatives to violating the law."[4]  *United States v. Bibbins*, 637 F.3d 1087, 1094

---

[4] Generally speaking, necessity—typically presented as a situation where the actor claims he chose "the lesser of two evils"—is a type of

(9th Cir. 2011) (quoting *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125–26 (9th Cir. 2001)).

---

justification defense. *See* 2 Wayne R. LaFave, *Substantive Criminal Law* § 10.1(a) (3d ed. 2017) ("One who, under the pressure of circumstances, commits what would otherwise be a crime may be justified by 'necessity' in doing as he did and so not be guilty of the crime in question."); *see also United States v. Biggs*, 441 F.3d 1069, 1071 (9th Cir. 2006) ("Evidence that a defendant had no reasonable opportunity to avoid the use of force is relevant only to a defense of justification, whether labeled duress, coercion, or necessity."). We have, however, tended to treat necessity and justification as separate and distinct defenses in felon-in-possession cases. *See United States v. Gomez*, 92 F.3d 770, 774 n.5 (9th Cir. 1996); *see also* 1A Kevin F. O'Malley, Jay E. Grenig & Hon. William C. Lee, *Federal Jury Practice and Instructions* § 19.02 (6th ed. 2018) (summarizing the different elements for a justification and necessity defense in this circuit). The elements of a justification defense are: (1) the defendant acted under unlawful and present threat of death or serious bodily injury; (2) "he did not recklessly place himself in a situation where he would be forced to engage in criminal conduct"; (3) there was no reasonable legal alternative; and (4) "there was a direct causal relationship between the criminal action and the avoidance of the threatened harm." *Gomez*, 92 F.3d at 775 (quoting *United States v. Lemon*, 824 F.2d 763, 765 (9th Cir. 1987)); *see also United States v. Beasley*, 346 F.3d 930, 933 n.2 (9th Cir. 2003) (reciting the same elements); 9th Cir. Model Crim. Jury Instr. 6.7 (2010) (same).

We have typically analyzed similar felon-in-possession cases raising a necessity or duress defense "in terms of justification" and under the justification elements. *Gomez*, 92 F.3d at 774; *see also Beasley*, 346 F.3d at 933. Here, however, Barnes—with his arguments and proposed jury instructions—distinctly raised a defense of necessity and the district court analyzed Barnes's offer of proof using the elements of a necessity defense. On appeal, the parties argue whether Barnes has met the requirements to present a necessity defense, not a justification defense. Accordingly, we review Barnes's evidence to determine whether he has sufficiently made out a case for necessity. We conclude that he has not, under either the test for necessity or for justification.

We agree with the district court that Barnes's offers of proof, even when viewed in the light most favorable to him, were insufficient to show that he acted to prevent imminent harm. "[T]he term 'imminent harm' connotes a real emergency, a crisis involving immediate danger to oneself or to a third party." *United States v. Maxwell*, 254 F.3d 21, 27 (1st Cir. 2001). There is no indication that Barnes acted in response to such a crisis. There was no evidence that the children had, for instance, already obtained possession of the gun or were about to do so. There was no evidence that the children were in close proximity to the firearm. At most, Barnes removed a dangerous weapon from a house where children were present.[5] Accordingly, the district court correctly denied Barnes's request to present a necessity defense to the jury.[6]

## V.

On the record before us, Barnes has met his burden of showing judicial abandonment under *Leon*. Nonetheless, the evidence here cannot be suppressed because the officers executing the infirm warrant were unaware—and had no reason to be aware—of any judicial misconduct. This result

---

[5] Unlike the D.C. Circuit, *see United States v. Mason*, 233 F.3d 619 (D.C. Cir. 2000), we do not recognize an "innocent possession" defense to felon-in-possession charges. *See United States v. Johnson*, 459 F.3d 990, 998 (9th Cir. 2006) (declining to adopt the D.C. Circuit's reasoning in *Mason* to create an innocent possession defense).

[6] We note that even if Barnes's situation constituted an imminent emergency, he had a number of options available to him that did not involve taking possession of the gun. He could have, for example, removed the children from the house or asked another adult in the house to dispose of the firearm. Because there were other legal alternatives available, Barnes failed to make the requisite offer of proof to present a necessity defense. *See Bibbins*, 637 F.3d at 1094.

underscores the critical role that judges play as "the only effective guardian of Fourth Amendment rights." *Illinois v. Gates*, 462 U.S. 213, 275 (1983) (Brennan, J., dissenting). When judges fail to uphold that duty, they open the door to unjustified intrusions by the state. This, in turn, undermines confidence in the judiciary's ability to safeguard the people's constitutional rights. It is therefore our hope—as it was the Supreme Court's in *Leon*—that judicial abandonment will prove to be an aberration, rather than the norm.

**AFFIRMED.**